## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| JOHN JAMES BURNETT | ) | |
| Plaintiff, | ) | CIVIL ACTION No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN POSTAL WORKERS | ) | |
| HOUSE (APWH), Residential Property | ) | |
| 801 RESIDENCE, Residential Property | ) | |
| CRM RESIDENTIAL, Management | ) | |
| BERGER ASSOCIATES, LLC | ) | |
| Management | ) | |
| ROBERT BERGER, Owner/Property | ) | |
| Manager | ) | |
| JOSEPH BERGER, Property Manager | ) | |
| NAKEISHA SIMMONS, Assistant | ) | |
| Property Manager | ) | Civil Action for: Disability Discrimination |
| ERICA JOHNSON, Property Manager | ) | Fair Housing Act (FHA), Americans With |
| KENNETH GILYARD, Security Supervisor | ) | Disabilities Act (ADA), False imprisonment, |
| YVONNE McKOY, Security Guard | ) | Punitive Damages, Injunctive Relief, |
| ANTHONY JOHNSON, Security Guard | ) | |
| SHAWN WILLIAMS, Security Guard | ) | |
| C.J. HAN, Security Guard | ) | |
| Defendants | ) | JURY TRIAL DEMANDED |

_____

## CIVIL ACTION - COMPLAINT

COMES NOW, Plaintiff JOHN J. BURNETT, by and through his undersigned attorney and counsel, for a Complaint against the Defendants, named in the caption above, and in this civil action does hereby request monetary relief, award of economic and non-economic damages, punitive damages, injunctive or equitable relief and declaratory judgment, or any other form of relief deemed just and proper by this Honorable Court, and does submit the following pleadings of fact and law:

1

## JURISDICTIONAL STATEMENT

1. This Honorable Court has jurisdiction over this civil matter by virtue of a federal question under 28 U.S.C. § 1331 and supplemental jurisdiction over state-based claims pursuant to 28 U.S.C. § 1332.

2. Venue is proper within this District pursuant to 28 U.S.C. § 1391(b), where all facts pleaded occurred within this district as they pertain to the actions and or omissions, including management or supervision, of the residential property of Defendants 801 Residence/APWH, et. al. located at 801 Locust St., Philadelphia, PA which is located in Philadelphia County.

3. Venue is proper within this District where all rights, privileges and immunities of Plaintiff and injuries suffered and damages caused, pertinent to this cause of action and claimed herein, each and all arose under federal and state law within this venue in Philadelphia County.

## PRELIMINARY STATEMENT

4. This civil action is brought by Plaintiff against Defendants 801 Residence/APWH, et. al. for violations of federal law under the Fair Housing Act (FHA), 42 U.S.C. §§ 3602, 3604, and 3601-3619, as well as under Title III of the Americans with Disability Act (ADA), 42 U.S.C. §§ 12181-12182 for discrimination in housing as to disability and for violations of all federal and states nondiscrimination statutes, including Section 504 of the Rehabilitation Act of 1973, a.k.a. "Section 504", which applies to a program or activity primarily engaged in providing low income, elderly, and special needs housing through federal financial assistance, as well as the Pennsylvania Human Relations Act (PHRA), which prohibits discrimination in housing based on disability or handicap.

5.  This civil action is brought by Plaintiff for related state-based claims in tort under Pennsylvania law for intentional and gross infliction of emotional distress, and defamation.

6.  Defendants 801 Residence/APWH, et. al. are landlords who own and operate residential premises and a place of public accommodation under the definitions of the FHA and ADA.

7.  Defendants 801 Residence/APWH, et. al. and their managers, employees, and agents named herein, acted with intent to coerce, intimidate, and threaten Plaintiff, and did conspire to act in direct retaliation for Plaintiff's availing himself of his rights under the FHA as defined in 42 U.S.C. §§ 3617[1], ADA, Section 504, and PHRA.

8.  Defendants 801 Residence/APWH, et. al. are liable to Plaintiff under theory of *respondeat superior,* because it did harm Plaintiff through the actions of its property managers, employees and agents, each named defendant herein, who were at all times acting under direction, supervision, management and control, within the scope of employment.

9.  Defendants 801 Residence/APWH, et. al. continue to engage in ongoing violations of the nondiscrimination statutes, as part of a pattern and practice of discriminatory actions that began prior to, during, and after the sale or purchase or transfer of ownership of the residential property which, upon information and belief, took place in December 2021.

10. This civil action is timely because the violations of federal law pleaded herein are still being committed by Defendants 801 Residence/APWH in an ongoing and continuous pattern of discriminatory actions that persist to the present time.

11. Plaintiff continues to suffer injuries and harm due to a lack of reasonable accommodation for his disability and as a result of unlawful discrimination.

---

[1] Pursuant to 42 U.S.C. §§ 3617, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

12. Defendants 801 Residence/APWH, et. al. committed intentional torts under Pennsylvania common law for intentional and gross infliction of emotional distress and defamation by knowingly publishing materially false information and allegations in Plaintiff's case file and before tribunals and courts of record and to federal and local investigative agencies, intentionally harming his reputation.

13. As a direct result of the unlawful actions of Defendants 801 Residence/APWH Plaintiff has suffered pain and suffering, humiliation, grief, embarrassment, frustration, and other forms of severe emotional distress.

**THE PARTIES**

14. Plaintiff is a resident of Philadelphia County and a tenant of the residential premises located at 801 Locust St. Apartment 34 Philadelphia, PA 19107, which is owned and operated by Defendants 801 Residence/APWH.

15. Defendants 801 Residence/American Postal Workers House (APWH) is a business entity operating as owner, manager, and landlord of the residential premises located at 801 Locust Street, Philadelphia, PA 19107.

16. Defendants 801 Residence/APWH operates as a building management company whose primary business functions, location and operations are located in Philadelphia County in the Commonwealth of Pennsylvania.

17. Defendants 801 Residence/APWH is currently under the management, supervision and control of Defendant, CRM RESIDENTIAL, Management, since December, 2021.

18. Defendant Erica JOHNSON, Property Manager is an employee and agent with supervisorial responsibilities of Defendant 801 Residence/APWH and an employee and agent of Defendant CRM RESIDENTIAL.

19. Defendant CRM RESIDENTIAL is a business entity whose principal business address is listed as 36 S. Main St. Ambler, PA 19002 in Montgomery County, Pennsylvania.

20. Defendant 801 Residence/APWH  listed their business address on multiple business records including with the City of Philadelphia's Department of Licenses & Inspections as 114 Forrest Ave. Suite 100, Narberth, PA 19072 **Exhibit B**, Philadelphia Licenses & Inspections Documents

21. Defendant BERGER ASSOCIATES, LLC is a business entity whose primary operations are located in Philadelphia County with principal business address listed as 114 Forrest Ave. Suite 100 Narberth, PA 19072, as listed on multiple business records and as reported to and by the U.S.  Department of Housing and Urban Development. **Exhibit H**, HUD Complaint, filed  December 2, 2019

22. Defendant BERGER ASSOCIATES, LLC also do business as "BERGER AND COMPANY" with a business address and location listed as 2701 E. Luzerne St., Philadelphia, PA 19137, as directly reported to and published online by U.S. Department of Housing and Urban Development (HUD). **Exhibit U**, HUD.GOV, Property Listed as Low Income, Elderly and Special Needs Housing

23. Defendants CRM RESIDENTIAL & Defendants BERGER ASSOCIATES, are hereinafter referred to as Defendants, "Management Companies", and operated during all times pertinent to the pleadings as the supervisors and agents of Defendants 801 Residence/APWH.

24. Defendants 801 Residence/APWH, et. al., including the named Defendant, Management Companies, are jointly and severally liable to Plaintiff, for violations of the federal disability discrimination laws and intentional torts pleaded herein under Pennsylvania state law.

25. Defendant Robert BERGER, Owner/Property Manager was at all times pertinent to the pleadings an employee and agent of Defendant 801 Residence/APWH acting as resident manager with supervisorial responsibilities, from September 2017 to December 2021.

26. Defendant Robert BERGER, Owner/Property Manager was at all times pertinent to the pleadings an employee and agent with supervisorial responsibilities, and an employee of Defendant BERGER ASSOCIATES and Defendant 801 Residence/APWH.

27. Defendant Robert BERGER, Owner/Property Manager is listed as Property Manager on various business records of Defendants 801 Residence/APWH, including its non-discrimination policy notices.

As always, we make every effort to ensure that you continue to receive housing assistance so that you can enjoy your home in our community. The owner/agent is dedicated to providing decent, safe, and affordable housing to our residents. If you have any questions about this notice, please contact the management office. We look forward to hearing from you.

Property Manager
Cc: Resident File
Attachment: HUD 5380 VAWA Notice/HUD 5382 VAWA Certification

The owner/agent does not discriminate on the basis of disability status in the admission or access to, or treatment or employment in, its federally assisted programs and activities.

The person named below has been designated to coordinate compliance with the nondiscrimination requirements contained in the Department of Housing and Urban Development's regulations implementing Section 504 (24 CFR, part 8 dated June 2, 1988).

Name: Robert Berger
Address: 114 Forrest Avenue
City  Philadelphia          State    PA      Zip 19072
Telephone  Voice  610-660-8501

**Exhibit N**, Notice of Material Lease Violation, dated June 17, 2019

28. Defendant Joseph BERGER, Property Manager was at all times pertinent to the pleadings an employee and agent with supervisorial responsibilities of Defendant 801 Residence/APWH, from September 2017 to December 2021.

29. Defendant Joseph BERGER, Property Manager was an employee and agent of Defendant, BERGER ASSOCIATES acting as resident manager of 801 Locust St. with supervisorial responsibilities, from September 2017 to December 2021.

30. Defendant Joseph BERGER is listed as Property Manager on various business records of Defendants 801 Residence/APWH, including non-discrimination policy notices.

31. Defendant Nakeisha SIMMONS, Assistant Property Manager was, from September 2017 to the present, and at all times pertinent to the pleadings, an employee and agent of Defendant CRM RESIDENTIAL and Defendant 801 Residence/APWH.

32. Defendant Erica JOHNSON, Property Manager was from approximately January 2022 to the present, and at all times pertinent to the pleadings, an employee and agent of Defendant CRM RESIDENTIAL and Defendant 801 Residence/APWH.

33. Defendant Kenneth GILYARD, Security Supervisor was from September 2017 to the present, or otherwise at all times pertinent to the pleadings, employee and agent of Defendant 801 Residence/APWH.

34. Defendant Yvonne McKOY, Security Guard was from September 2017 to the present or otherwise at all times pertinent to the pleadings, an employee and agent of Defendant 801 Residence/APWH.

35. Defendant Shawn WILLIAMS, Security Guard was from September 2017 to the present or otherwise at all times pertinent to the pleadings, an employee and agent of Defendant 801 Residence/APWH.

36. Defendant ANTHONY JOHNSON, Security Guard was from September 2017 to the present or otherwise at all times pertinent to the pleadings, an employee and agent of Defendant 801 Residence/APWH.

37. Defendant C.J. HAN, Security Guard was from September 2017 to the present or otherwise at all times pertinent to the pleadings, an employee and agent of Defendant 801 Residence/APWH.

38. Defendants GILYARD, McKOY, WILLIAMS, JOHNSON, and HAN shall be referred to hereinafter as Defendant, "Security Guards."

39. Defendants 801 Residence/APWH, et. al. each had individual and separate contact with Plaintiff, had knowledge of Plaintiff's disability, on a regular basis communicated with Plaintiff about his disability and requests for reasonable accommodations, and are jointly and severally liable to Plaintiff for the injuries he suffered as a result of the disability discrimination and intimidation, coercion, and harassment they caused him to suffer.

## STATEMENT OF FACTS

### *Federally Subsidized Housing*

40. On September 1, 2017 Plaintiff  signed a residential lease and became a tenant with his landlord, Defendant 801 Residence/APWH. **Exhibit A**, Model Lease for Subsidized Programs

41. In the residential lease at Paragraph 21 the landlord agrees to not engage in discrimination based on disability. **Exhibit A**

42. Plaintiff is currently a tenant of Defendants 801 Residence/APWH in Apartment 316.

43. Plaintiff's Apartment 316 is located on the 3rd floor at the farthest end of a single corridor furthest away from all accessible elevators.

44. Defendants 801 Residence/APWH provide access to three (3) separate elevators.

45. Elevators #1 and #2 are for general use, referred to herein as "General Service Elevators".

46. A third elevator that is larger in size and directly adjacent to the General Service Elevators is provided to residents, and referred to herein as the "Freight Elevator #3."

47. Freight Elevator #3, upon information and belief, can generally be made available to all residents of 801 Locust St. and can be operated and adjustment by Defendants 801 Residence/APWH, et. al.

48. Freight Elevator #3 during all times pertinent to the pleadings could be summoned individually from the 3rd floor of 801 Locust St.

49. Defendants 801 Residence/APWH provides various common areas to its tenants, such as a rooftop and balcony area.

50. Defendants 801 Residence/APWH do not provide a laundry room on the 3rd floor, requiring Plaintiff to travel by elevator to a separate floor, e.g. the 2nd floor.

*Plaintiff determined to be disabled by federal agencies*

51. Plaintiff is determined by the  Social Security Administration (SSA) to have become disabled on January 13, 2011.  **Exhibit C**, Social Security verification letter

52. Plaintiff receives federally subsidized rent administered through the U.S. Department of Housing and Urban Development (HUD). In February, 2022 Plaintiff completed Recertification with Defendants 801 Residence/APWH. **Exhibit D**, HUD Recertification

*Plaintiff is disabled under definitions of federal law*

53. Plaintiff has a disability which requires the use of a manually operated wheelchair, motorized scooter, or other power-driven mobility device  (OPDMD). **Exhibit J**, ADA.gov, ADA Requirements: Wheelchairs, Mobility Aids, and Other Power-Driven Mobility Devices

54. Plaintiff utilizes a motorized scooter for his independent transportation and mobility needs.

55. Plaintiff is unable to operate a manual wheelchair without assistance from a third-party due to his disability.

*Adequate Notice of disability*

56. Plaintiff's disability requiring use of a wheelchair is clearly and plainly visible.

57. Defendants 801 Residence/APWH, et. al., first received notice of Plaintiff's disability when he applied for housing prior to taking possession of the premises in September 2017.

58. Plaintiff regularly and routinely used his manual wheelchair with third-party assistance on the residential premises of Defendants 801 Residence/APWH from September 2017 to December 2017, and periodically or as needed thereafter.

59. Plaintiff regularly and routinely used one of his motorized scooters which he operated independently on the residential premises of Defendants 801 Residence/APWH from December 2018 to the present.

***Requests for Reasonable Accomodations***

60. From September 2017 to the present, Plaintiff made multiple verbal and written requests with Defendants 801 Residence/APWH, et. al. for various reasonable accommodations related to his disability.

61. Plaintiff from September 2017 to the present communicated verbally and in writing on multiple occasions to Defendants 801 Residence/APWH, et. al. a request to relocate to a residential unit closer to the elevators. **Exhibit R**, Letter for Meeting; Re: Reasonable Accommodation, dated December 20, 2018

62. Plaintiff from September 2017 to the present communicated verbally and in writing on multiple occasions to Defendants 801 Residence/APWH, et. al. a request to have adequate and regular access to the Freight Elevator #3 which he cannot summon independently from the 3rd floor.

63. Plaintiff communicated his reason for the request for adequate access to the Freight Elevator #3 because it best accommodates the size of his motorized scooters.

64. The General Service elevators cannot reasonably accommodate the size of the motorized scooters.

65. Since September 2017 to the present, Defendants 801 Residence/APWH have made no changes and/or alterations in their practices and/or policies regarding Plaintiff's requests for accommodations.

66. As a result of the actions and conduct of Defendants 801 Residence/APWH, Plaintiff could not adequately or readily access the elevators with his Motorized Scooter (Blue).

67. Plaintiff can only access the General Service elevators with his Motorized Scooter (Red) after making modifications, i.e. removing the storage basket.

68. The General Service elevators only accommodate Plaintiff's Motorized Scooter (Red) when there are no other passengers requiring Plaintiff to wait an additional unreasonable amount of time for a vacant elevator.

***Plaintiff requests a unit closer to the elevators as a reasonable accommodation***

69. Plaintiff met with Defendants 801 Residence/APWH, et. al. and was shown Apartment 316 prior to being accepted as a resident and before moving in.

70. Plaintiff upon viewing Apartment 316 promptly requested an apartment unit closer to the elevators because of his disability.

71. Plaintiff on September 1, 2017 after taking possession of the premises again requested that Defendants 801 Residence/APHW et. al., provide a residential unit closer to the elevators.

72. On January 4, 2019, Plaintiff received an email from Defendants 801 Residence/APWH electronically signed by Defendant, Joseph BERGER, which states "I will be in touch with you to reschedule your Reasonable Accommodation meeting regarding moving your

apartment down the hall closer to the elevators, per your request." **Exhibit F**, <u>Email dated 01/04/2019, from Defendant Joseph BERGER, Property Manager</u>

73. Defendants 801 Residence/APWH, et. al. denied Plaintiff's requests for a unit closer to the elevators.

***Plaintiff purchases a motorized scooter and requests a reasonable accommodation***

74. On December 7, 2017 Plaintiff purchased a Heavy Duty Motorized Scooter, (Blue), in order to accommodate his height and weight and independent mobility needs. **Exhibit E**, <u>Photograph of Blue Motorized Scooter</u>

75. Plaintiff's Motorized Scooter (Blue) allows him to independently operate and maneuver himself without the assistance of a manually-operated wheelchair or third-party assistance.

76. Plaintiff made verbal and written requests with Defendants 801 Residence/APWH for access to the Freight Elevator #3 in order to accommodate the size of his Motorized Scooter (Blue) .

77. Defendant 801 Residence/APWH denied Plaintiff's requests for access to the Freight Elevator #3.

78. Defendants 801 Residence/APWH, et. al. through Defendant Joseph BERGER, specifically denied Plaintiff's request to access Freight Elevator #3 in writing.

79. Defendant 801 Residence/APWH in a writing dated January 4, 2019 stated that "the courtesy extended to [Plaintiff] will end with the receipt of this letter", referencing termination of access to Freight Elevator #3.



**Exhibit O**, <u>Letter to deny Reasonable Accommodation</u>

80. Defendants 801 Residence/APWH took no actions in regards to Plaintiff's requests for elevator access, never made any modifications or changes to practices and/or policies, and never fulfilled the verbal agreement made with Plaintiff regarding Freight Elevator #3.

***Plaintiff makes complaints to HUD and Commission on Human Relations (PCHR)***

81. Plaintiff made complaints with the U.S. Department of Housing and Urban Development, (HUD) and the City of Philadelphia's Commission on Human Relations, (PCHR).

    **Exhibit G**, <u>PCHR Complaint, filed September 5, 2019</u>

    **Exhibit H**, <u>HUD Complaint, filed December 2, 2019</u>

82. Plaintiff did withdraw the PCHR Complaint.

    **Exhibit G-1**, <u>PCHR Complaint, Withdrawn January 28, 2020</u>

83. Plaintiff's HUD Complaint was dismissed without further adequate investigation.

    **Exhibit H-1**, <u>HUD Complaint, dismissed on June 5, 2020</u>

84. Plaintiff's complaints to PCHR and HUD resulted in no change to the practices and policies of landlord Defendant 801 Residence/APWH.

85. Defendants 801 Residence/APWH, et. al. made a number of misrepresentations of fact to a federal agency, U.S. Department of Housing and Urban Development, (HUD), during the course of its investigation of the incidents reported by Plaintiff.

86. Defendants 801 Residence/APWH, et. al. made a number of misrepresentations of fact to a local municipal agency, City of Philadelphia's Commission on Human Relations (PCHR), in response to complaints and grievances initiated by Plaintiff.

87. The fraudulent misrepresentations and false statements of Defendants 801 Residence/APWH, et. al. made to the federal and municipal investigative agencies caused irreparable harm to Plaintiff who remains without access to the elevators and whose ingress and egress to and from his residential unit with his motorized scooters remains restricted.

*False Representations to HUD*

88. Defendants 801 Residence/APWH represented to Plaintiff and to HUD that they refused to honor this accommodation because it would constitute a "fundamental alteration of the their program" where Plaintiff only required access to an existing Freight Elevator #3.  **Exhibit H-1**, HUD Complaint, dismissed on June 5, 2020

89. Defendant 801 Residence/APWH made false statements to HUD when it stated Plaintiff's request to move his unit closer to the elevators was not received until January 7, 2019.

90. Defendant 801 Residence/APWH first received Plaintiff's request to move his unit closer to the elevators in September 2017, and issued a letter dated December 20, 2018 to meet with Plaintiff to discuss this request. **Exhibit R**

*Plaintiff purchases a smaller Motorized Scooter (Red)*

91. Plaintiff purchased in May, 2021 a Motorized Scooter (Red) that is smaller in size than his "Heavy Duty" Motorized Scooter (Blue).

92. Plaintiff's Motorized Scooter (Red) is accommodated by the 1st and 2nd elevators but only when the basket for carrying belongings is detached and removed.

93. Plaintiff's Motorized Scooter (Red) is only accommodated by the General Services elevators when there are no other passengers present on the elevator.

94. Plaintiff requires the basket be attached to his Motorized Scooter (Red) in order to complete simple tasks and chores.

95. Plaintiff's preference remains use of his larger Motorized Scooter (Blue) because it better accommodates his height, weight, and size, and is capable of higher speeds for use on the streets of Philadelphia.

96. Plaintiff's Motorized Scooter (Blue) is safer and more utile for Plaintiff's daily independent mobility purposes on the premises of Defendant 801 Residence/APWH and in general public.

97. Plaintiff notified Defendant 801 Residence/APWH through its management company, Defendant CRM RESIDENTIAL, and in writing via email to Defendant Erica JOHNSON, Property Manager and Defendant Nakeishah SIMMONS, Assistant Property Manager of his disability and need for a reasonable accommodation.

98. Plaintiff again notified Defendant 801 Residence/APWH in a writing dated May, 2022 of his disability and need to use a mobility device, e.g. one of his motorized scooters.

99. On April 30, 2022, Defendants 801 Residence/APWH notified Plaintiff that he was not permitted to store his Motorized Scooter (Red) anywhere outside the property such as in the valet waiting area, e.g. pick-up and drop-off spot and without obstructive traffic.

100.   In an email directly to Plaintiff in response to a reasonable accommodation request regarding the motorized scooter, Defendant Nakeishah SIMMONS denies that Plaintiff ever made a request by stating "No such reasonable accommodation was ever submitted to the management office. Please forward to the new manager at ejohnson@crmresidential.com."

***Plaintiff provided information regarding his serious medical conditions***

101.   Plaintiff notified his Defendant 801 Residence/APWH of his disability, both verbally and in writing, of his medical conditions and the need for access to elevators in order to attend his life-sustaining dialysis treatments.

102.   On or around September 1, 2017, or shortly thereafter, Defendants 801 Residence/APWH received notice that Plaintiff's medical condition required dialysis treatment 3 times a week, specifically the mornings of Monday, Wednesdays, and Fridays.

103.   Plaintiff's inability to access the elevators with his Motorized Scooter (Blue) caused him significant delays in attending his life-sustaining dialysis treatments.

***Medical Conditions***

104.   Since September, 2017 Plaintiff regularly and routinely attends dialysis treatments scheduled Mondays, Wednesdays, and Fridays, of every week, with only slight modifications for holidays or necessary emergencies.

105.   On April 25, 2017, Plaintiff began regular chronic dialysis treatment at Davita Center, Walnut Tower, 834 Walnut St, Philadelphia, PA 19107. **Exhibit I**, <u>Letter from Davita Center</u>

106.   Plaintiff was a Renal Patient requiring weekly dialysis treatments before he began his tenancy at Defendant 801 Residence/APWH on September 1, 2017.

107.   Plaintiff began requiring hemodialysis beginning May 1, 2017.

108.    Plaintiff's medical condition required surgery on his left foot, amputation of his two toes,

in 2010.

109.    Plaintiff was hospitalized for three days again in March, 2022 for complications with his

left foot and wounds on his skin.

110.    Plaintiff's disability and recent injury to his foot and wounds further impairs his mobility

and so he requires the assistance of a power-driven mobility device.

***Access to Elevators is purposefully restricted***

111.    Defendant, Joseph BERGER was present in the lobby when Plaintiff's Motorized Scooter

(Blue) arrived at the premises of Defendant 801 Residence/APWH while still in its

packaging.

112.    Plaintiff reported to Defendants 801 Residence/APWH promptly that his Motorized

Scooter (Blue) could not be accommodated by the General Service Elevators because it did

not fit adequately.

113.    Plaintiff promptly requested as needed use of the Freight Elevator #3 in order to

accommodate his recently purchased Motorized Scooter (Blue), in writing via email and

verbally.

114.    Defendant, Joseph BERGER, Property Manager assented  and agreed verbally to allow

Plaintiff access to Freight Elevator #3.

115.    Defendant, Joseph BERGER stated to Plaintiff that Defendants, Security Guards would

be instructed and authorized to send the Freight Elevator #3 to the 3rd Floor upon telephonic

requests from Plaintiff.

116.   Plaintiff first attempted to contact Defendants, Security Guards on the mornings of his

dialysis treatments, shortly following his purchase of the Motorized Scooter (Blue) beginning

the week of Monday, December 25, 2017.

117.   Defendants 801 Residence/ APWH, et. al. did not fulfill this agreement to call, summon,

or send the Freight Elevator #3 to accommodate Plaintiff's request.

118.   Failure of Defendants 801 Residence/APWH to call the Freight Elevator #3 for Plaintiff

caused him unnecessary delay, embarrassment, frustration, and tardiness for various

appointments such as life-sustaining dialysis treatments and other medical appointments, on

an ongoing basis.

119.   Beginning December, 2017 Plaintiff made a routine habit of making telephone calls to

Defendants, Security Guards and request the Freight Elevator #3.

120.   Defendants, Security Guards did not fulfill Plaintiff's requests.

121.   Defendant 801 Residence/APWH acting through its agents and employees, named

Defendant, Security Guards, did not summon Freight Elevator #3 for Plaintiff.

122.   Plaintiff without access to the Freight Elevator #3 has no ability to ingress and egress

from his 3rd floor apartment using his heavy duty motorized scooter.

123.   Plaintiff's independent mobility and access to other common areas in the building such as

the laundry room and mail room is restricted because of lack of access to the elevators.

124.   During the entire period of his occupation of the premises, Plaintiff experienced either

significant delays or total inability to access the Freight Elevator #3.

125.   Plaintiff was informed on various occasions by named Defendants, Security Guards that

they were either not instructed, not authorized, or no longer authorized to fulfill Plaintiff's

requests and call Freight Elevator #3.

126.    Plaintiff ceased making attempts to request Freight Elevator #3 and generally stopped contacting Defendants 801 Residence/APWH for assistance with the Freight Elevator #3 after he was summoned for eviction proceedings in June, 2019.

127.    Plaintiff stopped contacting Defendants 801 Residence/APWH, et. al. because the lack of assistance caused him significant delays in gaining ingress and egress to the premises from the elevators. Plaintiff feared retaliation and further notices of lease violations being brought against him if he continued making requests for reasonable accommodations related to his disability.

128.    Plaintiff was not able to travel independently in his Motorized Scooter (Blue) and called upon third-parties, family members, and friends to assist him with transportation in a manually operated wheelchair.

***Lack of access to the elevators hinders mobility and basic use and enjoyment of the premises***

129.    The intentional actions of Defendants 801 Residence/APWH, et. al. prevented, restricted, obstructed, and otherwise interfered with Plaintiff's ability to utilize his motorized scooter and unreasonably restricted his access to the elevators, severely limiting his ability to gain ingress and egress to the premises.

130.    The intentional actions of Defendants 801 Residence/APWH, et. al. restricted Plaintiff's mobility and access to the premises confining him to use of his manually operated wheelchair, which required manual operation by a third-party, caretaker, or one of his family members or friends.

131.    Plaintiff's inability to access the elevators caused him harm, frustration, grief, embarrassment, anger, and severe emotional distress.

132.   Plaintiff's inability to access the elevators restricted his movement on or about the premises in an unreasonable manner.

***Plaintiff should not be required to modify his mobility device***

133.   Upon Plaintiff complaining verbally about lack of access to the elevators Defendants 801 Residence/APWH, et. al.  suggested verbally and in writing via email that Plaintiff make modifications to the motorized scooters, for instance, by removing a storage basket which comes attached when purchased.

134.   Plaintiff's Motorized Scooter (Blue) is not accommodated by the General Service Elevators even when the storage basket is removed.

135.   Plaintiff requires the basket on his motorized scooter to complete basic chores like shopping and carrying personal items.

136.   Plaintiff notified Defendants 801 Residence/APWH, et. al. that he needs the storage basket to complete basic chores and errands, like grocery-shopping, and carrying personal items.

137.   Plaintiff complained to Defendants 801 Residence/APWH, et. al.  that even without the storage basket the Motorized Scooter (Blue) would still not fit in the General Service elevators.

138.   Plaintiff notified Defendants 801 Residence/APWH that the Motorized Scooter (Red) is only accommodated by the General Service elevators after removing the storage basket, which Plaintiff needs for completing basic tasks like shopping and carrying personal items.

139.   The General Service elevators do not accommodate Plaintiff's Motorized Scooter (Red) when there are other passengers.

***Elevators lack adequate handrails for leaning to accommodate Plaintiff's disability***

140.    The elevators on the premises of Defendants 801 Residence/APWH lack adequate

guardrails or other handrails for leaning.

141.    Plaintiff due to his disability is not able to comfortably stand up and lean on any handrails

or guardrails in the elevators.

142.    Freight Elevator #3 lacks accessible handrails as the walls are covered by tarp.

***False accusations against Plaintiff causing severe emotional harm and distress***

143.    Defendants 801 Residence/APWH, et. al. engaged in intimidation, abuse, and harassment

in order to and coerce and persuade Plaintiff into giving up on his claims and requests for a

reasonable accommodation.

144.    Defendants 801 Residence/APWH, et. al. falsely accused Plaintiff of various material

lease violations on a number of occasions, as outlined below.

145.    Defendants 801 Residence/ APWH, et. al. engaged in illegal and reprehensible

misconduct which persisted in an ongoing pattern of violations of Plaintiff's rights to be free

from disability discrimination.

146.    Defendants 801 Residence/ APWH, et. al. initiated against Plaintiff an unlawful eviction

based on false and fraudulent allegations.

147.    Defendants 801 Residence/APWH, et. al. withdrew the civil action for eviction due to

lack of probable cause or adequate proof.

***False eviction filed in retaliation against Plaintiff for requesting reasonable accommodation***

148.    Plaintiff was summoned for eviction proceedings filed by complaint on July 30, 2019 by

Defendant 801 Residence/APWH before the Municipal Court of Philadelphia County.

**Exhibit L**, Eviction Action, Filed July 30, 2019, *Withdrawn November 14, 2019* -

LT-19-07-30-7978

149.   The eviction complaint filed by Defendant 801 Residence/APWH was withdrawn on November 14, 2019. **Exhibit L**

150.   The "Landlord and Tenant Complaint" alleges a sole grounds of eviction, specifically "* Breach of a condition(s) of the lease other than nonpayment of rent. The conditions allegedly breached were: threats/harassment of management staff." **Exhibit L**

151.   Plaintiff was summoned to appear in person in Municipal Court of Philadelphia County on Friday, September 13, 2019.

152.   Due to pre-scheduled dialysis treatments, Plaintiff could not make a court appearance on a Friday.

153.   Plaintiff hired for representation Community Legal Services (CLS) , a non-profit legal services organization which represents individuals who are unable to afford a private attorney.

154.   Plaintiff's attorney, Ian Carlton, Esq., on August 30, 2019 requested a continuance of the September 13, 2019 hearing date noting that Defendant 801 Residence/APWH did not consent or respond to his continuance requests.

155.   A continuation was granted by the Municipal Court and the hearing was moved to Thursday, September 26, 2019.

156.   Plaintiff appeared in Municipal Court on September 26, 2019 and maintained his innocence to the charges and requested a bench-trial before the municipal court judge.

157.   Plaintiff received a subpoena to return to court on November 14, 2019.

158.   Plaintiff appeared in Municipal Court again on Thursday, November 14, 2019, whereupon the Landlord-Tenant Complaint was Withdrawn.

*False accusations of unauthorized occupant*

159.     On December 12, 2017, Plaintiff received notice of an incident report from his landlord,

Defendant 801 Residence/APWH regarding Plaintiff's stepson, a minor child, J.W.

160.     On December 18, 2017, Plaintiff received notice from landlord Defendants 801

Residence/APWH for having unauthorized occupants living with him.

161.     The allegations of unauthorized occupants lodged against Plaintiff by Defendant 801

Residence/APWH are materially false and fraudulent because minor child J.W. and his

mother, Myeisha Roberson, who was Plaintiff's caregiver at the time, were authorized guests.

162.     Plaintiff explained to Defendants 801 Residence/APWH that minor child, J.W. and his

mother, Myeisha Roberson were authorized visitors.

163.     Upon information and belief, Defendant 801 Residence/APWH maintained a Notice of

Lease Violation for this allegation and continued to publish it in Plaintiff's case file,

potentially threatening eviction and thereby damaging his federal housing subsidy.

164.     The minor child, J.W., who was under the age of 14 at the time, had authorization of

Plaintiff and J.W.'s mother, Myeisha Roberson, to stay under Plaintiff's care and supervision.

*False accusations of intimidation and harassment*

165.     On Sunday, December 23, 2018, Plaintiff contacted Defendant C.J. HAN, Security Guard

in a telephonic request to send the Freight Elevator #3 to the 3rd floor.

166.     Plaintiff identified himself and the reason for the request when he made the call from his

landline while still in his residential unit, kindly and courteously requesting that Defendant

C.J. HAN, Security Guard send the Freight Elevator #3 in about 5-10 minutes.

167.     Plaintiff required prompt attendance at a life-sustaining dialysis treatment session that

morning pursuant to a Winter Holiday schedule modification.

168.  Defendant C.J. HAN, Security Guard did not send the Freight Elevator #3 as requested, but instead argued in a confrontational manner and asked Plaintiff over the phone whether or not he needed to transport personal belongings.

169.  Plaintiff responded that he needed Freight Elevator #3 for his independent mobility needs and further that he urgently needed to attend life-sustaining dialysis treatments that very same morning.

170.  Plaintiff arrived at the elevators shortly thereafter and called Defendant C.J. HAN from his cellphone, but no one answered.

171.  Plaintiff then waited 30 minutes before the Freight Elevator #3 arrived and only because another resident happened to be exiting from it at that time.

172.  Plaintiff boarded the Freight Elevator #3 with his Motorized Scooter (Blue) and upon exiting witnessed and spoke briefly with the Defendant C.J. HAN, Security Guard who was still sitting at the front desk.

173.  Plaintiff inquired verbally why Defendant C.J. HAN, Security Guard did not answer the phone or send the Freight Elevator #3.

174.  Defendant C.J. HAN, Security Guard stated that he was no longer authorized to send Freight Elevator #3 for Plaintiff.

175.  Plaintiff was never notified previously verbally or in writing of this change in policy or instructions.

176.  Plaintiff drove himself to the Davita Dialysis Center that morning on his Motorized Scooter (Blue), but was significantly late to his appointment.

177.  Immediately thereafter, Plaintiff again informed Defendant Joseph BERGER that the Defendants, Security Guards were not honoring the reasonable accommodation agreement

regarding Plaintiff's use of the elevators and motorized scooter, and further that the actions of Defendant Security Guard, C.J. HAN were "life threatening." **Exhibit S**, <u>Email to Landlord, Re: Life-Threatening Event</u>

178.    On December 25, 2018, Plaintiff informed Defendant Joseph BERGER that the situation was "life-threatening" because of his restricted access to the elevators.  **Exhibit S**

179.    Defendant Joseph BERGER, Property Manager informed Plaintiff that the "courtesy" extended previously regarding use of the Freight Elevator #3 was hereby terminated.

    **Exhibit O**, <u>Letter to deny Reasonable Accommodation</u>

180.    Throughout Plaintiff's tenancy at Defendants 801 Residence/APWH, on multiple occasions prior, during and after, January 4, 2019, Defendants, Security Guards stated that they were not authorized to summon Freight Elevator #3 for Plaintiff.

181.    Upon information and belief, Defendant 801 Residence/APWH maintained the Notice of Lease Violation for this matter and continued to publish it in Plaintiff's case file, potentially threatening eviction and thereby damaging his federal housing subsidy.

***False accusations of "fraud, deception, firearms or other weapons"***

182.    On January 4, 2019 Defendants 801 Residence/APWH issued a "Notice of Lease Violation" which was placed into Plaintiff's file. **Exhibit K**, <u>Notice of Lease Violation, dated January 04, 2019</u>

183.    The "Notice of Lease Violation" dated January 4, 2019 alleges that Plaintiff engaged in "activity that would constitute an offense against person, property, public order public health, decency or that involves fraud, deception firearms or other weapons." **Exhibit K**

184.    The "Notice of Lease Violation" states that "On 12/23/2018 and 12/24/2018 building staff reported that you had been screaming racial slurs at them. Please be reminded that this

behavior is considered verbally abusive and inappropriate. The staff that you directed these racial slurs towards are considering their options at this time. Your abusive and inappropriate behavior must stop. Thank you, Joseph Berger Property Manager." **Exhibit K**

185.    Plaintiff never engaged in any activity as alleged by Defendant 801 Residence/APWH in the "Notice of Lease Violation" dated January 4, 2019. **Exhibit K**

186.    Defendants 801 Residence/APWH persistent publication and continuous practice of making false accusations has caused Plaintiff to suffer immense grief, embarrassment, humiliation, and frustration, amounting to systematic series of intentional acts intended to cause Plaintiff to suffer intimidation, coercion and harassment further deterring him from making requests for a reasonable accommodations due to his disability.

*False accusation of "threaten[ing] health, safety, or right to peaceful enjoyment"*

187.    On June 17, 2019 Defendants 801 Residence/APWH issued Plaintiff a letter titled "Notice of Lease Violation." **Exhibit N**, <u>Notice of Material Lease Violation, June 17, 2019</u>

188.    The "Notice of Lease Violation" alleges that Plaintiff on June 13, 2019 and June 14, 2019 "verbally harassed and threatened violence" to the staff of Defendant 801 Residence/APWH. **Exhibit N**

189.    The "Notice of Lease Violation" letter alleges a "Violation of Lease", term Page 7., Section 23, which claims "Criminal activity… that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents including property management staff…" **Exhibit N**

*False letters requesting a meeting*

190.    On June 21, 2019, Defendant 801 Residence/APWH issued a letter titled "06/19/2019 Appeal Meeting Follow-up." **Exhibit O**, <u>Letter for Meeting, dated June 21, 2019</u>

191.    The letter dated June 21, 2019 references a supposed meeting with Plaintiff which never

took place, when it states "Thank you for meeting with me today to discuss your lease

termination notice." **Exhibit O**

192.    Plaintiff did not meet with Defendants 801 Residence/APWH on either June 19, 2019 or

June 21, 2019.

193.    On June 28, 2019, Defendants 801 Residence/APWH issued a letter titled "06/19/2019

Appeal Meeting Follow-up".

**Exhibit P**, Letter for Meeting, dated June 28, 2019

194.     Defendant, Robert BERGER  signed the "06/19/2019 Appeal Meeting Follow-up" letter.

**Exhibit P**

195.    The June 28, 2019 letter titled  "06/19/2019 Appeal Meeting Follow-up" letter is copied

to Defendant, Joseph BERGER. **Exhibit P**

196.    The June 28, 2019 letter titled The "06/19/2019 Appeal Meeting Follow-up" letter claims

a meeting took place with Plaintiff on June 19, 2019. **Exhibit P**

197.    Plaintiff did not meet with Defendants 801 Residence/APWH on June 19, 2019.

**COUNT I, VIOLATIONS OF THE FHA, ADA, SECTION 504, AND PHRA**

198.    Plaintiff hereby incorporates paragraphs ¶¶1 - 197, including any and all pertinent facts

and pleadings contained therein for purposes of this complaint.

199.    Defendants 801 Residence/APWH, et. al. are in direct violation of the clear mandates of

the FHA, ADA, Section 504, and PHRA, in their persistent, continuing, continuous and

ongoing misconduct and violations of federal and state anti-discrimination laws, committing

multiple violations which amount to a pattern of malicious intimidation, coercion, and

harassment, and further their actions and omissions, were intentional and/or grossly

negligent, acting in blatant and wanton disregard of Plaintiff's rights as a disabled and handicapped person, and in retaliation against Plaintiff for availing himself of his rights, privileges and immunities under federal and state law.

200.   Defendants 801 Residence/APWH, et. al. engaged in unlawful discrimination on the basis of Plaintiff's disability when he was repeatedly and continuously deprived of adequate access to the elevators while using his Motorized Scooter.

201.   Defendants 801 Residence/APWH, et. al. engaged in unlawful discrimination on the basis of Plaintiff's disability when absolutely no consideration was given to his reasonable requests for a residential unit closer to the elevators despite multiple requests being made verbally and in writing.

202.   Defendants 801 Residence/APWH, et. al. engaged in unlawful discrimination on the basis of Plaintiff's disability when he was not permitted to store his mobility device on the premises temporarily and as needed.

203.   Defendants 801 Residence/APWH, et. al. engaged in unlawful discrimination on the basis of Plaintiff's disability when he was subject to multiple false allegations of material lease violations, which severely harmed his reputation and caused him humiliation, frustration, embarrassment, grief, and anger, having a deterrent effect on his requests for reasonable accommodations and modifications, and generally spoiling entirely his quiet use and enjoyment of the premises.

204.   Defendants 801 Residence/APWH, et. al. engaged in unlawful discrimination on the basis of Plaintiff's disability when Defendants, Security Guards and Defendants, Property Managers mistreated, misunderstood, ignored, retaliated against, and/or otherwise neglected Plaintiff's requests for accommodations as pertains to his disability and need for a mobility

device, causing severe interference with his basis ingress and egress onto and off of the premises, and thereby causing reasonably foreseeable harm, for instance tardiness and unnecessary delays to important events including, but not limited to, regularly scheduled life-sustaining hemodialysis and routine medical appointments.

## COUNT II, AMERICANS WITH DISABILITIES ACT (ADA)

205.    Plaintiff hereby incorporates paragraphs ¶¶1 - 204, including any and all pertinent facts and pleadings contained therein for purposes of this complaint.

206.    Defendants 801 Residence/APWH are subject to the requirements of the FHA, Title III of the ADA, and Section 504 of the Rehabilitation Act, and the federal law prohibitions against disability discrimination and requirements of reasonable accommodations and modifications.

207.    Defendants 801 Residence/APWH receive federally subsidized rent from disable residents.

208.    Defendants 801 Residence/APWH are listed on the website of the U.S. Department of Housing and Urban Development (HUD), www.hud.gov, as a provider of "Low Income, Elderly and Special Needs Housing." **Exhibit U**, HUD.GOV, Property Listed as Low Income, Elderly and Special Needs Housing

209.    Plaintiff is entitled to injunctive relief for violations of Title III of the ADA which is made available in this private suits pursuant to 28 C.F.R. § 36.501.

210.    Plaintiff is entitled to attorney's fees for attorney's fees, litigation costs and expenses pursuant to 28 C.F.R. § 36.505 for violations of Title III of the ADA.

## COUNT III, Section 504 of the Rehabilitation Act of 1973

211.    Plaintiff hereby incorporates paragraphs ¶¶ 1 - 210, including any and all pertinent facts and pleadings contained therein for purposes of this complaint.

212.   Defendants 801 Residence/APWH are subject to the requirements of Section 504 of the Rehabilitation Act, and its prohibitions against disability discrimination and requirements of reasonable modifications, as a private organization, principally engaged in the business of housing, and conducting a program or activity that receives federal financial assistance or funding. 29 U.S.C. § 794

**COUNT IV, FHA Section 3617 Intimidation Coercion and Harassment**

213.   Plaintiff hereby incorporates paragraphs ¶¶ 1 - 212, including any and all pertinent facts and pleadings contained therein for purposes of this complaint.

214.   Defendants 801 Residence/APWH, et. al. actions, as described above, constituted intimidation, coercion, and harassment, as defined under the FHA.

**Count VI, Intentional and Gross Infliction of Emotional Distress**

215.   Plaintiff hereby incorporates paragraphs ¶¶ 1 - 212, including any and all pertinent facts and pleadings contained therein for purposes of this complaint.

216.   Defendants 801 Residence/APWH, et. al., as described above, were intentional and/or grossly negligent, and were inflicted upon and caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, frustration, anger, upsetness, and chagrin.

**Count VII, Defamation, Libel, Slander**

217.   Plaintiff hereby incorporates paragraphs ¶¶ 1 - 216, including any and all pertinent facts and pleadings contained therein for purposes of this complaint.

218.   Defendants 801 Residence/APWH, et. al., committed the intentional tort of defamation when made false allegations and material notice of lease violations and allegations in a municipal court action for eviction, knowingly and materially false statements and allegations, published in Plaintniff's case file which is available to prospective landlords and

to HUD, PCHR, and other investigative federal and state agencies, and had actual harm to Plaintiff's reputation and causing him further irreparable harm.

219.    WHEREFORE, Defendants 801 Residence/APWH, et. al. are jointly and severally liable to Plaintiff for violation of the FHA, ADA, Section 504, and PHRA for intentional, grossly negligent, and negligent violations of the federal and state anti-discrimination laws, for engaging in a continuous and ongoing pattern of violations, abuse and neglect, from committing acts of intimidation, coercion, and harassment against Plaintiff, for bringing false allegations and accusations as retaliation measures intended to punish or deter Plaintiff from availing himself of the rights, privileges, and immunities of protections under federal and state law, and

220.    THEREFORE, Defendants are liable to Plaintiff for failure to provide a reasonable accommodations, reasonable modifications, and for engaging in unlawful disability discrimination, and are jointly and severally liable to Plaintiff for attorney's fees, litigation costs and expenses, compensatory damages, economic and non-economic damages, punitive damages, injunctive or equitable relief, and/or declaratory judgment in his favor, and any other form of relief his Honorable Court deems just and proper.

Date: *06/10/2022*                          Respectfully submitted,

                                            /s/ Lucas T. Nascimento, Esq.

                                            Lucas T. Nascimento, Attorney at Law
                                            Land Title Building
                                            100 S. Broad St., Ste. 1830
                                            Philadelphia, PA 19110
                                            P: 215-944-4428
                                            C: 609-703-3441
                                            Nascimentolaw@gmail.com

## INDEX OF EXHIBITS

1. **Exhibit A**, Model Lease for Subsidized Programs

2. **Exhibit B**, Philadelphia Department of Licenses & Inspections Documents

3. **Exhibit C**, Social Security verification letter

4. **Exhibit D**, HUD Recertification Package

5. **Exhibit E**, Photograph of Motorized Scooter (Blue)

6. **Exhibit F**, Email dated 01/04/2019, from Defendant Joseph BERGER, Property Manager

7. **Exhibit G**, PCHR Complaint, filed September 5, 2019

    a. **Exhibit G-1**, PCHR Complaint, Withdrawn January 28, 2020

8. **Exhibit H**, HUD Complaint, filed December 2, 2019

    a. **Exhibit H-1**, HUD Complaint, dismissed on June 5, 2020

9. **Exhibit I**, Letter from Davita Center

10. **Exhibit J**, ADA.gov, ADA Requirements: Wheelchairs, Mobility Aids, and Other Power-Driven Mobility Devices

11. **Exhibit K**, Notice of Lease Violation, dated January 04, 2019

12. **Exhibit L**, Eviction Action, Filed July 30, 2019, *Withdrawn November 14, 2019*

13. **Exhibit M**, Notice to Vacate, dated July 23, 2019

14. **Exhibit N**, Notice of Material Lease Violation, dated June 17, 2019

15. **Exhibit O**, Letter for Meeting, dated June 21, 2019

16. **Exhibit P**, Letter for Meeting, dated June 28, 2019

17. **Exhibit Q**, Letter to Deny Reasonable Accommodation, dated January 4, 2019

18. **Exhibit R**, Letter for Meeting; Re: Reasonable Accommodation, dated December 20, 2018

19. **Exhibit S**, Email to Landlord, Re: Life-Threatening Event

20. **Exhibit T**, Photos of Violation of Motorized Scooter (Red)

21. **Exhibit U**, <u>HUD.GOV, Property Listed as Low Income, Elderly and Special Needs Housing</u>

# Exhibit A
## Model Lease for Subsidized Programs



# MODEL LEASE FOR SUBSIDIZED PROGRAMS

1. **Parties and Dwelling Unit:** The parties to this agreement are, American Postal Workers House referred to as the Landlord, and
JOHN J. BURNETT

   referred to as the Tenant.

   The Landlord leases to the Tenant(s) unit number 0316

   located at 801 LOCUST STREET 0316; PHILADELPHIA, PA 19107

   in the project known as AMERICAN POSTAL WORKERS HOUSE

2. **Length of Time (Term):** The initial term of this Agreement shall begin on September 01, 2017 and end
on August 31, 2018 . After the initial term ends, the Agreement will continue for
successive terms of one month each unless automatically terminated as permitted
by paragraph 23 of this Agreement.

3. **Rent:** The Tenant agrees to pay $ for the partial month ending on
. After that, Tenant agrees to pay a rent of $ 261.00 per
month. This amount is due on the 1st day of the month at
801 LOCUST STREET; PHILADELPHIA, PA 19107 .

   The Tenant understands that this monthly rent is less than the market (unsubsidized) rent
due on this unit. This lower rent is available either because the mortgage on this project is
subsidized by the Department of Housing and Urban Development (HUD) and/or because
HUD makes monthly payments to the Landlord on behalf of the Tenant. The amount, if
any, that HUD makes available monthly on behalf of the Tenant is called the tenant
assistance payment and is shown on the "Assistance Payment" line of the Owner's
Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures form
which is Attachment No. 1 to this Agreement.

4. **Changes in the Tenant's Share of the Rent:** The Tenant agrees that the amount of rent the Tenant pays and/or the amount of assistance
that HUD pays on behalf of the Tenant may be changed during the term of this Agreement
if:

   a. HUD or the Contract Administrator (such as a Public Housing Agency)
   determines, in accordance with HUD procedures, that an increase in rents is
   needed;

   b. HUD or the Contract Administrator changes any allowance for utilities or
   services considered in computing the Tenant's share of the rent;

   c. the income, the number of persons in the Tenant's household or other factors
   considered in calculating the Tenant's rent change and HUD procedures provide
   that the Tenant's rent or assistance payment be adjusted to reflect the change;

   d. changes in the Tenant's rent or assistance payment are required by HUD's
   recertification or subsidy termination procedures;



form HUD-90105a (12/2007)
ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

   e.   HUD's procedures for computing the Tenant's assistance payment or rent change; or
   f.   the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord.

The Landlord agrees to implement changes in the Tenant's rent or tenant assistance payment only in accordance with the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs. The Landlord agrees to give the Tenant at least 30 days advance written notice of any increase in the Tenant's rent except as noted in paragraphs 11, 15 or 17. The Notice will state the new amount the Tenant is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Tenant that he/she may meet with the Landlord to discuss the rent change.

5.   Charges for Late Payments and Returned Checks:

If the Tenant does not pay the full amount of the rent shown in paragraph 3 by the end of the 5th day of the month, the Landlord may Collect a fee of $5 on the 6th day of the month. Thereafter, the Landlord may collect $1 for each additional day the rent remains unpaid during the month it is due.

The Landlord may not terminate this Agreement for failure to pay late charges, but may terminate this Agreement for non-payment of rent, as explained in paragraph 23. The Landlord may collect a fee of $25.00 _____ on the second or any additional time a check is not honored for payment (bounces). The charges discussed in this paragraph are in addition to the regular monthly rent payable by the Tenant.

6.   Condition of Dwelling Unit

By signing this Agreement, the Tenant acknowledges that the unit is safe, clean and in good condition. The Tenant agrees that all Appliances and equipment in the unit are in good working order, except as described on the Unit Inspection Report, which is Attachment No. 2 to this Agreement. The Tenant also agrees that the Landlord has made no promises to decorate, alter, repair or improve the unit, except as listed on the Unit Inspection Report.

7.   Charges for Utilities and Services:

The following charts describe how the cost of utilities and services related to occupancy of the unit will be paid. The Tenant agrees that these charts accurately describe the utilities and services paid by the Landlord and those paid by the Tenant.

   a.   The Tenant must pay for the utilities in column (1). Payments should be made directly to the appropriate utility company. The items in column (2) are included in the Tenant's rent.

| (1) Put "x" by any Utility Tenant pays directly | Type of Utility | (2) Put an "x" by any utility included in Tenant Rent |
|---|---|---|
| x | Heat | |
| x | Lights, Electric | |
| x | Cooking | |
| | Water | x |
| | Other – Specify | |
| | SEWER | X |
| x | AiR Conditioner | |

   b.   The Tenant agrees to pay the Landlord the amount shown in column (3) on the date the rent is due. The Landlord certifies that HUD had authorized him/her to collect the type of charges shown in column (3) and that the amounts shown in column (3) do not exceed the amounts authorized by HUD.

 

form HUD-90105a (12/2007)
ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

|  | (3) |
| --- | --- |
|  | Show Amount Tenant Pays to Landlord in Addition to Rent |
| Parking | $ 75.00 |
| Other (Specify) | $ |
|  | $ |
|  | $ |
|  | $ |

8. Security Deposits:

The Tenant has deposited $ 359.00 _____ with the Landlord. The Landlord will hold this security deposit for the period the Tenant occupies the unit. After the Tenant has moved from the unit, the Landlord will determine whether the Tenant is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined in accordance with the following conditions and procedures.

  a. The Tenant will be eligible for a refund of the security Deposit only if the Tenant provided the Landlord with the 30-day written notice of intent to move required by paragraph 23, unless the Tenant was unable to give the notice for reasons beyond his/her control.

  b. After the Tenant has moved from the unit, the Landlord will inspect the unit and complete another Unit Inspection Report. The Landlord will permit the Tenant to participate in the inspection, if the Tenant so requests.

  c. The Landlord will refund to the Tenant the amount of the security deposit plus

  interest computed at 0.02 _____ %, beginning September 01, 2017 _____. less any

  amount needed to pay the cost of:

  (1) unpaid rent;
  (2) damages that are not due to normal wear and tear and are not listed on the Unit Inspection Report;
  (3) charges for late payment of rent and returned checks, as described in paragraph 5; and
  (4) charges for unreturned keys, as described in paragraph 9.

  d. The Landlord agrees to refund the amount computed in paragraph 8c within 30 _____ days after the Tenant has permanently moved out of the unit, returned possession of the unit to the Landlord, and given his/her new address to the Landlord. The Landlord will also give the Tenant a written list of charges that were subtracted from the deposit. If the Tenant disagrees with the Landlord concerning the amounts deducted and asks to meet with the Landlord, the Landlord agrees to meet with the Tenant and informally discuss the disputed charges.

  e. If the unit is rented by more than one person, the Tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to any Tenant identified in Paragraph 1 of this Agreement.

  f. The Tenant understands that the Landlord will not count the Security Deposit towards the last month's rent or towards repair charges owed by the Tenant in accordance with paragraph 11.

9. Keys and Locks:

The Tenant agrees not to install additional or different locks or gates on any doors or windows of the unit without the written permission of the Landlord. If the Landlord approves the Tenant's request to install such locks, the Tenant agrees to provide the Landlord with a key for each lock. When this Agreement ends, the Tenant agrees to return all keys to the dwelling unit to the Landlord. The Landlord may charge the Tenant $ 31.00 for each key not returned.

10. Maintenance:

  a. The Landlord agrees to:

 

Page 3 of 10

form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

    (1)  regularly clean all common areas of the project;
    (2)  maintain the common areas and facilities in a safe condition;
    (3)  arrange for collection and removal of trash and garbage;
    (4)  maintain all equipment and appliances in safe and working order;
    (5)  make necessary repairs with reasonable promptness;
    (6)  maintain exterior lighting in good working order;
    (7)  provide extermination services, as necessary; and
    (8)  maintain grounds and shrubs.

b.  The Tenant agrees to:

    (1)  keep the unit clean;
    (2)  use all appliances, fixtures and equipment in a safe manner and only for the purposes for which they are intended;
    (3)  not litter the grounds or common areas of the project;
    (4)  not destroy, deface, damage or remove any part of the unit, common areas, or project grounds;
    (5)  give the Landlord prompt notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the unit or related facilities; and
    (6)  remove garbage and other waste from the unit in a clean and safe manner.

**11. Damages:**    Whenever damage is caused by carelessness, misuse, or neglect on the part of the Tenant, his/her family or visitors, the Tenant agrees to pay:

    a.  the cost of all repairs and do so within 30 days after receipt of the Landlord's demand for the repair charges; and
    b.  rent for the period the unit is damaged whether or not the unit is habitable. The Tenant understands that HUD will not make assistance payments for any period in which the unit is not habitable. For any such period, the Tenant agrees to pay the HUD-approved market rent rather than the Tenant rent shown in paragraph 3 of this agreement.

**12. Restrictions on Alterations:**    No alteration, addition, or improvements shall be made in or to the premises without the prior consent of the Landlord in writing. The Landlord agrees to provide reasonable accommodation to an otherwise eligible tenant's disability, including making changes to rules, policies, or procedures, and making and paying for structural alterations to a unit or common areas. The Landlord is not required to provide accommodations that constitute a fundamental alteration to the Landlord's program or which would pose a substantial financial and administrative hardship. See the regulations at 24 CFR Part 8. In addition, if a requested structural modification does pose a substantial financial and administrative hardship, the Landlord must then allow the tenant to make and pay for the modification in accordance with the Fair Housing Act.

**13. General Restrictions:**    The Tenant must live in the unit and the unit must be the Tenant's only place of residence. The Tenant shall use the premises only as a private dwelling for himself/herself and the individuals listed on the Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, Attachment 1.  The Tenant agrees to permit other individuals to reside in the unit only after obtaining the prior written approval of the Landlord. The Tenant agrees not to:

    a.  sublet or assign the unit, or any part of the unit;
    b.  use the unit for unlawful purposes;
    c.  engage in or permit unlawful activities in the unit, in the common areas or on the project grounds;
    d.  have pets or animals of any kind in the unit without the prior written permission of the Landlord, but the landlord will allow the tenant to keep an animal needed as a reasonable accommodation to the tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities; or

 

form HUD-90105a (12/2007)
I ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

        c.   make or permit noises or acts that will disturb the rights or comfort of neighbors. The Tenant agrees to keep the volume of any radio, phonograph, television or musical instrument at a level, which will not disturb the neighbors.

14. Rules:

The Tenant agrees to obey the House Rules, which are Attachment No. 3 to this Agreement. The tenant agrees to obey additional rules established after the effective date of this Agreement if:

    a.   the rules are reasonably related to the safety, care and cleanliness of the building and the safety, comfort and convenience of the Tenants; and

    b.   the Tenant receives written notice of the proposed rule at least 30 days before the rule is enforced.

15. Regularly Scheduled Recertifications:

Every year around the first day of May _____, the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required by HUD for the purposes of determining the Tenant's rent and assistance payment, if any. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The landlord will verify the information supplied by the Tenant and use the verified information to re-compute the amount of the Tenant's rent and assistance payment, if any.

    a.   If the Tenant does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may impose the following penalties. The Landlord may implement these penalties only in accordance with the administrative procedures and time frames specified in HUD's regulations, handbooks and instructions related to the administration of multifamily subsidy programs.

        (1)  Require the Tenant to pay the higher, HUD-approved market rent for the unit.

        (2)  Implement any increase in rent resulting from the recertification processing without providing the 30-day notice otherwise required by paragraph 4 of this Agreement.

    b.   The Tenant may request to meet with the Landlord to discuss any change in rent or assistance payment resulting from the recertification processing. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and discuss how the Tenant's rent and assistance payment, if any, were computed.

16. Reporting Changes Between Regularly Scheduled Recertifications:

    a.   If any of the following changes occur, the Tenant agrees to advise the Landlord immediately.

        (1)  Any household member moves out of the unit.

        (2)  An adult member of the household who was reported as unemployed on the most recent certification or recertification obtains employment.

        (3)  The household's income cumulatively increases by $200 or more a month.

    b.   The Tenant may report any decrease in income or any change in other factors considered in calculating the Tenant's rent. Unless the Landlord has confirmation that the decrease in income or change in other factors will last less than one month, the Landlord will verify the information and make the appropriate rent reduction. However, if the Tenant's income will be partially or fully restored within two months, the Landlord may delay the certification process until the new income is known, but the rent reduction will be retroactive and the Landlord may not evict the Tenant for nonpayment of rent due during the period of the reported decrease and the completion of the certification process. The Tenant has thirty days after receiving written notice of any rent due for the above described time period to pay or the Landlord can evict for nonpayment of rent. (Revised 3/22/89)

    c.   If the Tenant does not advise the Landlord of these interim changes, the Landlord may increase the Tenant's rent to the HUD-approved market rent. The Landlord




form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

may do so only in accordance with the time frames and administrative procedures set forth in HUD's regulations, handbooks and instructions on the administration of multifamily subsidy programs.

d.  The Tenant may request to meet with the Landlord to discuss how any change in income or other factors affected his/her rent or assistance payment, if any. If the Tenant requests such a meeting, the Landlord agrees to meet with the Tenant and explain how the Tenant's rent or assistance payment, if any, was computed.

17. Removal of Subsidy:

a.  The Tenant understands that assistance made available on his/her behalf may be terminated if events in either items 1 or 2 below occur. Termination of assistance means that the Landlord may make the assistance available to another Tenant and the Tenant's rent will be re-computed. In addition, if the Tenant's assistance is terminated because of criterion (1) below, the Tenant will be required to pay the HUD-approved market rent for the unit.

(1)  The Tenant does not provide the Landlord with the information or reports required by paragraph 15 or 16 within 10 calendar days after receipt of the Landlord's notice of intent to terminate the Tenant's assistance payment.

(2)  The amount the Tenant would be required to pay towards rent and utilities under HUD rules and regulations equals the Family Gross Rent shown on Attachment 1.

b.  The Landlord agrees to give the Tenant written notice of the proposed termination. The notice will advise the Tenant that, during the ten calendar days following the date of the notice, he/she may request to meet with the Landlord to discuss the proposed termination of assistance. If the Tenant requests a discussion of the proposed termination, the Landlord agrees to meet with the Tenant.

c.  Termination of assistance shall not affect the Tenant's other rights under this Agreement, including the right to occupy the unit. Assistance may subsequently be reinstated if the Tenant submits the income or other data required by HUD procedures, the Landlord determines the Tenant is eligible for assistance, and assistance is available.

18. Tenant Obligation To Repay:

If the tenant submits false information on any application, certification or request for interim adjustment or does not report interim changes in family income or other factors as required by paragraph 16 of this Agreement, and as a result, is charged a rent less than the amount required by HUD's rent formulas, the Tenant agrees to reimburse the Landlord for the difference between the rent he/she should have paid and the rent he/she was charged. The Tenant is not required to reimburse the Landlord for undercharges caused solely by the Landlord's failure to follow HUD's procedures for computing rent or assistance payments.

19. Size of Dwelling

The Tenant understands that HUD requires the Landlord to assign units in accordance with the Landlord's written occupancy standards. These standards include consideration of unit size, relationship of family members, age and sex of family members and family preference. If the Tenant is or becomes eligible for a different size unit, and the required size unit becomes available, the Tenant agrees to:

a.  move within 30 days after the Landlord notifies him/her that a unit of the required size is available within the project; or

b.  remain in the same unit and pay the HUD-approved market rent.

20. Access by Landlord:

a.  The Landlord agrees to enter the unit only during reasonable hours, to provide reasonable advance notice of his/her intent to enter the unit, and to enter the unit only after receiving the Tenant's consent to do so, except when urgency situations make such notices impossible or except under paragraph (c) below.

b.  The Tenant consents in advance to the following entries into the unit:



form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

    (i) The tenant agrees to permit the Landlord, his/her agents or other persons, when authorized by the Landlord, to enter the unit for the purpose of making reasonable repairs and periodic inspections.

    (ii) After the Tenant has given a notice of intent to move, the Tenant agrees to permit the Landlord to show the unit to prospective tenants during reasonable hours.

c. If the Tenant moves before this Agreement ends, the Landlord may enter the unit to decorate, remodel, alter or otherwise prepare the unit for re-occupancy.

**21. Discrimination Prohibited:** The Landlord agrees not to discriminate based upon race, color, religion, creed, National origin, sex, age, familial status, and disability.

**22. Change in Rental Agreement:** The Landlord may, with the prior approval of HUD, change the terms and conditions of this Agreement. Any changes will become effective only at the end of the initial term or a successive term. The Landlord must notify the Tenant of any change and must offer the Tenant a new Agreement or an amendment to the existing Agreement. The Tenant must receive the notice at least 60 days before the proposed effective date of the change. The Tenant may accept the changed terms and conditions by signing the new Agreement or the amendment to the existing Agreement and returning it to the Landlord. The Tenant may reject the changed terms and conditions by giving the Landlord written notice that he/she intends to terminate the tenancy. The Tenant must give such notice at least 30 days before the proposed change will go into effect. If the Tenant does not accept the amended agreement, the Landlord may require the Tenant to move from the project, as provided in paragraph 23.

**23. Termination of Tenancy:**

a. To terminate this Agreement, the Tenant must give the Landlord 30-days written notice before moving from the unit.

b. Any termination of this Agreement by the Landlord must be carried out in accordance with HUD regulations, State and local law, and the terms of this Agreement.

c. The Landlord may terminate this Agreement for the following reasons:

    (1) the Tenant's material noncompliance with the terms of this Agreement;

    (2) the Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;

    (3) drug related criminal activity engaged in on or near the premises, by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control;

    (4) determination made by the Landlord that a household member is illegally using a drug;

    (5) determination made by the Landlord that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

    (6) criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control:

        (a) that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);

        (b) or that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises;

    (7) if the tenant is fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that in the case of the State of New Jersey, is a high misdemeanor;

    (8) if the tenant is violating a condition of probation or parole under Federal or State law;

    (9) determination made by the Landlord that a household member's abuse or




form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

(10) if the Landlord determines that the tenant, any member of the tenant's household, a guest or another person under the tenant's control has engaged in the criminal activity, regardless of whether the tenant, any member of the tenant's household, a guest or another person under the tenant's control has been arrested or convicted for such activity.

d.  The Landlord may terminate this Agreement for other good cause, which includes, but is not limited to, the tenant's refusal to accept change to this agreement. Terminations for "other good cause" may only be effective as of the end of any initial or successive term.

The term material noncompliance with the lease includes: (1) one or more substantial violations of the lease; (2) repeated minor violations of the lease that (a) disrupt the livability of the project; (b) adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment to the leased premises and related project facilities, (c) interfere with the management of the project, or (d) have an adverse financial effect on the project (3) failure of the tenant to timely supply all required information on the income and composition, or eligibility factors, of the tenant household (including, but not limited to, failure to meet the disclosure and verification requirements for Social Security Numbers, or failure to sign and submit consent forms for the obtaining of wage and claim information from State Wage Information Collection Agencies), and (4) Non-payment of rent or any other financial obligation due under the lease beyond any grace period permitted under State law. The payment of rent or any other financial obligation due under the lease after the due date but within the grace period permitted under State law constitutes a minor violation.

e.  If the Landlord proposes to terminate this Agreement, the Landlord agrees to give the Tenant written notice and the grounds for the proposed termination. If the Landlord is terminating this agreement for "other good cause," the termination notice must be mailed to the Tenant and hand-delivered to the dwelling unit in the manner required by HUD at least 30 days before the date the Tenant will be required to move from the unit and in accordance with State law requirements. Notices of proposed termination for other reasons must be given in accordance with any time frames set forth in State and local law. Any HUD-required notice period may run concurrently with any notice period required by State or local law. All termination notices must:

- specify the date this Agreement will be terminated;
- state the grounds for termination with enough detail for the Tenant to prepare a defense;
- advise the Tenant that he/she has 10 days within which to discuss the proposed termination of tenancy with the Landlord. The 10-day period will begin on the earlier of the date the notice was hand-delivered to the unit or the day after the date the notice is mailed. If the Tenant requests the meeting, the Landlord agrees to discuss the proposed termination with the Tenant;
- and advise the Tenant of his/her right to defend the action in court.

f.  If an eviction is initiated, the Landlord agrees to rely only upon those grounds cited in the termination notice required by paragraph e.

24. Hazards:   The Tenant shall not undertake, or permit his/her family or guests to undertake, any hazardous acts or do anything that will increase the project's insurance premiums. Such action constitutes a material non-compliance. If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Tenant, the Tenant will be responsible for rent only up to the date of the destruction. Additional rent will not accrue until the unit has been repaired to a livable condition.

25. Penalties for   Knowingly giving the Landlord false information regarding income or other factors

 

Printed by Yardi Systems, Inc.

form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

| Submitting False Information: | considered in determining Tenant's eligibility and rent is a material noncompliance with the lease subject to termination of tenancy. In addition, the Tenant could become subject to penalties available under Federal law. Those penalties include fines up to $10,000 and imprisonment for up to five years. |

26. **Contents of this Agreement:** This Agreement and its Attachments make up the entire agreement between the Landlord and the Tenant regarding the unit. If any Court declares a particular provision of this Agreement to be invalid or illegal, all other terms of this Agreement will remain in effect and both the Landlord and the Tenant will continue to be bound by them.

27. **Attachments to the Agreement:** The Tenant certifies that he/she has received a copy of this Agreement and the following Attachments to this Agreement and understands that these Attachments are part of this Agreement.
    a. Attachment No. 1 – Owner's Certification of Compliance with HUD's Tenant Eligibility and Rent Procedures, form HUD-50059
    b. Attachment No. 2 - Unit Inspection Report.
    c. Attachment No. 3 - House Rules (if any).

28. **Tenants' rights to organize:** Landlord agrees to allow tenant and tenant organizers to conduct on the property the activities related to the establishment or operation of a tenant organization set out in accordance with HUD requirements.

29. **Tenant Income Verification:** The Tenant must promptly provide the Landlord with any letter or other notice by HUD to a member of the family that provides information concerning the amount or verification of family income in accordance with HUD requirements.

30. The lease agreement will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason.

31. **Signatures:**

TENANT BY:

1. _____  9 , 1 , 20'7
   JOHN J. BURNETT                    Date Signed
2. _____  __/__/__
                                      Date Signed
3. _____  __/__/__
                                      Date Signed
4. _____  __/__/__
                                      Date Signed
5. _____  __/__/__
                                      Date Signed
6. _____  __/__/__
                                      Date Signed

LANDLORD BY: _____  9 / 1 / 20'7
                                      Date Signed

*Public reporting burden - HUD is not requesting approval of any burden hours for the model leases since use of leases are a standard business practice in the housing rental industry. This information is required to obtain benefits. The request and required supporting documentation are sent to HUD or the Contract Administrator (CA) for approval. The lease is a contract between the owner of the project and the tenant(s) that explains the terms for residing in the unit. Leases are a standard business practice in the housing rental industry. Owners are required to use the HUD model lease which includes*

 

Page 9 of 10

form HUD-90105a (12/2007)
l ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

*terms normally covered by leases used in the housing rental industry plus terms required by HUD for the program under which the project was built and/or the program providing rental assistance to the tenants.*

*This information is authorized by 24 CFR 5.360, 236.750, 880.606, 883.701, 884.215, 886.127, 891.425, 891.625 and 891.765 cover lease requirements and provisions. This information is considered non-sensitive and does not require any special protection.*



form HUD-90105a (12/2007)
1 ref. HB 4350.3 Rev. 1

Printed by Yardi Systems, Inc.

ADDITION TO HUD MODEL LEASE 90105-a

HOUSEHOLD PETS

The TENANT is permitted to keep common household pets in his/her dwelling unit(subject to the provisions in 24 CFR Part 5 Subpart C) and the pet rules promulgated under 24 CFR 5.315). Any pet rules promulgated by the LANDLORD are attached hereto and incorporated hereby. The TENANT agrees to comply with these rules. A violation of these rules may be grounds for removal of the pet or termination of the TENANT's (pet owner's) tenancy (or both), in accordance with the provisions of 24 CFR Part 5, Subpart C and applicable regulations and State or local law. These regulations include 24 CFR Part 247 (Evictions From Certain Subsidized and HUD-Owned Projects) and provisions governing the termination of tenancy under the Project Rental Assistance Contract.

Note:  .The Part 5 Pet Rules do not apply to an animal used by a Tenant or visitor that is needed as a reasonable accommodation for the Tenant's or visitor's disability.  .

[Optional] The LANDLORD may after reasonable notice to the TENANT and during reasonable hours, enter and inspect the premises. Entry and inspection is permitted only if the LANDLORD has received a signed, written complaint alleging (or the LANDLORD has reasonable grounds to believe) that the conduct or condition of a pet in the dwelling unit constitutes, under applicable State or local law, a nuisance or a threat to the health or safety of the occupants of the project or other persons in the community where the project is located.

If there is not State or local authority (or designated agent of such an authority) authorized under applicable State or local law to remove a pet that becomes vicious, displays symptoms of severe illness, or demonstrates other behavior that constitutes an immediate threat to the health or safety of the tenancy as a whole, the LANDLORD may enter the premises (if necessary), remove the pet, and take such action with respect to the pet as may be permissible under State and local law, which may include placing it in a facility that will provide care and shelter for a period not to exceed 30 days. The LANDLORD shall enter the premises and remove the pet or take such other permissible action only if the LANDLORD requests the TENANT (pet owner) to remove the pet from the project immediately, and the TENANT (pet owner) refuses to do so, or if the LANDLORD is unable to contact the TENANT (pet owner) to make a removal request. The cost of the animal care facility shall be paid as provided in 24 CFR 5.363.

Signatures:
TENANT
BY: _John B Butt_    Date Signed _9-1-2017_
1.
2._____ Date Signed _____

LANDLORD
BY: _G d aflen_    Date Signed _9-1-2017_
_____

VIOLENCE, DATING    OLENCE          **U.S. Department of Hou  .g**          OMB Approval No. 2502-0204
OR STALKING                          **and Urban Development**
                                       Office of Housing

# LEASE ADDENDUM
## VIOLENCE AGAINST WOMEN AND JUSTICE DEPARTMENT REAUTHORIZATION ACT OF 2005

LANDLORD:  American Postal Workers House

TENANT:
        JOHN J. BURNETT

UNIT NO & ADDRESS: 0316
801 LOCUST STREET 0316; PHILADELPHIA, PA 19107

This lease addendum adds the following paragraphs to the Lease between the above referenced
Tenant and Landlord.

## Purpose of the Addendum

The lease for the above referenced unit is being amended to include the provisions of the
Violence Against Women and Justice Department Reauthorization Act of 2005 (VAWA).

## Conflicts with Other Provisions of the Lease

In case of any conflict between the provisions of this Addendum and other sections of the Lease,
the provisions of this Addendum shall prevail.

## Term of the Lease Addendum

The effective date of this Lease Addendum is  09/01/2017                    . This Lease Addendum
shall continue to be in effect until the Lease is terminated.

## VAWA Protections

1. The Landlord may not consider incidents of domestic violence, dating violence or stalking as
   serious or repeated violations of the lease or other "good cause" for termination of assistance,
   tenancy or occupancy rights of the victim of abuse.

2. The Landlord may not consider criminal activity directly relating to abuse, engaged in by a
   member of a tenant's household or any guest or other person under the tenant's control, cause
   for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate
   member of the tenant's family is the victim or threatened victim of that abuse.

3. The Landlord may request in writing that the victim, or a family member on the victim's
   behalf, certify that the individual is a victim of abuse and that the Certification of Domestic
   Violence, Dating Violence or Stalking, Form HUD-91066, or other documentation as noted
   on the certification form, be completed and submitted within 14 business days, or an agreed
   upon extension date, to receive protection under the VAWA. Failure to provide the
   certification or other supporting documentation within the specified timeframe may result in
   eviction.

JOHN J. BURNETT

9-1-2017
Date

_____
Date

_____
Date

_____
Date

_____
Date

_____
Date

Landlord

9-1-2017
Date

# Exhibit B

## Philadelphia Department of Licenses & Inspections Documents

B



City of Philadelphia
Department of
Licenses & Inspections
P.O. Box 53310
Philadelphia, Pa. 19105

**DISPLAY PROMINENTLY**
if required by law

AMERICAN POSTAL WORKERS
114 FORREST AVENUE
STE 100
NARBETH, PA  19072
USA

3202    Rental
AMERICAN POSTAL WORKERS
801 LOCUST ST, Philadelphia, 19107-5507

Child aged 6 or under?: No                    Constructed before 1978?: No
Owner Occupied: No                            Number of Units: 300

THIS LICENSE IS GRANTED TO THE PERSON AND LOCATION FOR THE PURPOSE STATED ABOVE.
IT IS SUBJECT TO IMMEDIATE CANCELLATION BY THIS DEPARTMENT FOR VIOLATIONS OF
CITY ORDINANCES AND REGULATIONS.  INQUIRIES 311  (215-686-8686).

| LICENSE CODE | LICENSE NO. | COMMERCIAL ACTIVITY LIC. | EXPIRATION DATE | EFFECTIVE DATE |
|---|---|---|---|---|
| 3202 | 217263 | 017518 | 2/29/2020 | 2/4/2019 |

The Philadelphia Property Maintenance Code  (Section PM-102.6.4)  requires an owner offering
residential  property for rent to provide to the tenant, at the inception of each tenancy, a Certificate of
Rental Suitability issued by the Department of Licenses and Inspections no more than sixty (60) days
prior to the inception of the tenancy. Visit  the Licenses, Permits & Certificates section at
www.phila.gov  to obtain this required Rental Suitability Certificate.

# LICENSE

Interpreter services available. | خدمات الترجمة الشفهية متوفرة لدينا | กรุณาสามารถให้บริการล่ามได้ | 提供口译服务 | Services d'interprétation
disponibles. | 통역이 제공됩니다 | Предоставляются услуги устного переводчика. | Se brindan servicios de interpretación. | Có sẵn dịch vụ thông dịch.

**City of Philadelphia**

**Certificate of Rental Suitability**

CITY OF PHILADELPHIA
DEPARTMENT OF
LICENSES & INSPECTIONS
1401 JOHN F. KENNEDY BLVD.
PHILADELPHIA, PA 19102-1667

**Date Issued:** 7/13/2017     **Expiration Date:** 9/11/2017     **Certificate Number:** 215924

**Address:** 801  LOCUST        ST

**Rental License Number:** 217263     **Number of Licensed Units (Zoning):** 300

In accordance with Philadelphia Code Section PM-102.6.4, at the inception of each tenancy, an owner shall provide to the tenant a Certificate of Rental Suitability issued by the Department of Licenses and Inspections no more than sixty (60) days prior to the inception of the tenancy.

A search of the Department of Licenses & Inspections' data records indicates that on the date issued there are no available notices of uncorrected code violations on file for the property.

**Owner's Affidavit:**

The owner of the premises to be leased acknowledges the obligation to provide a fit and habitable property and states that all fire protection and smoke detection equipment for the premises is present and in proper operating order in accordance with all applicable requirements of the Philadelphia Code and regulations and standards adopted there under, and that the operating systems are in a fit and habitable condition, and the owner will continue to maintain all fire protection and smoke detection equipment for the premises in accordance with all applicable requirements of the Philadelphia Code and regulations and standards adopted there under, and the operating systems and the property in a fit and habitable condition.In addition, I attest that I have provided the tenant with a copy of the City of Philadelphia's "Partners for Good Housing" brochure in one of the published languages requested by the tenant.

**Rental Unit Number:** 316

**Signature:** SARaghu     **Date:** 9-1-2017

**Name:** Sandra A-RAGHU

(please print)

**NOTICE TO TENANT:**

This Certificate is valid only if signed by the owner and a copy of "Partners for Good Housing" is attached. To report code violations please contact the Department of Licenses & Inspections at 311 or 215-686-8686 if outside the City. All complaints are confidential.

# Exhibit C
## Social Security verification letter





# Social Security Administration
# **Benefit Verification Letter**

JOHN JAMES BURNETT
APT 316
801 LOCUST ST
PHILADELPHIA PA  19107-5523

You asked us for information from your record. The information that you requested is shown below. If you want anyone else to have this information, you may send them this letter.

## Information About Current Social Security Benefits

Beginning December 2021, the full monthly Social Security benefit before any deductions is $1,404.70.

We deduct $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment is $1,404.00.
(We must round down to the whole dollar.)

Social Security benefits for a given month are paid the following month. (For example, Social Security benefits for March are paid in April.)

Your Social Security benefits are paid on or about the third of each month.

We found that you became disabled under our rules on January 13, 2011.

## Information About Past Social Security Benefits

From December 2020 to November 2021, the full monthly Social Security benefit before any deductions was $1,326.50.

We deducted $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment was $1,326.00.
(We must round down to the whole dollar.)

## Type of Social Security Benefit Information

You are entitled to monthly disability benefits.

See Next Page

## Information About Current Social Security Benefits

Beginning May 1983, the full monthly Social Security benefit before any deductions is $0.00.

We deduct $0.00 for medical insurance premiums each month.

The regular monthly Social Security payment is $0.00.
(We must round down to the whole dollar.)

Benefits were stopped beginning May 1983.

Social Security benefits for a given month are paid the following month. (For example, Social Security benefits for March are paid in April.)

Your Social Security benefits are paid on or about the third of each month.

## Type of Social Security Benefit Information

You are entitled to monthly benefits as a dependent of the wage earner.

## Medicare Information

You are entitled to hospital insurance under Medicare beginning July 2013.

You are entitled to medical insurance under Medicare beginning July 2013.

Your Medicare number is ███████████   You may use this number to get medical services while waiting for ███████████ ard.

If you have any questions, please log into Medicare.gov, or call 1-800-MEDICARE (1-800-633-4227).

## Date of Birth Information

The date of birth shown on our records is February 23, 1964.

## Suspect Social Security Fraud?

Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

## If You Have Questions

We invite you to visit our web site at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local office at 1-866-613-3969. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
2 PENN CTR STE 2000A
1500 JFK BLVD 20TH FL
PHILADELPHIA PA 19102

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

### *Social Security Administration*

# Exhibit D
## HUD Recertification Package



U.S. Department of Housing and Urban Development

# Document Package for Applicant's/Tenant's Consent to the Release Of Information

**This Package contains the following documents:**

1. HUD-9887/A Fact Sheet describing the necessary verifications

2. Form HUD-9887 (to be signed by the Applicant or Tenant)

3. Form HUD-9887-A (to be signed by the Applicant or Tenant and Housing Owner)

4. Relevant Verifications (to be signed by the Applicant or Tenant)

Each household must receive a copy of the 9887/A Fact Sheet, form HUD-9887, and form HUD-9887-A.

# Verification of Information Provided by Applicants and Tenants of Assisted Housing

### What Verification Involves

To receive housing assistance, applicants and tenants who are at least 18 years of age and each family head, spouse, or co-head regardless of age must provide the owner or management agent (O/A) or public housing agency (PHA) with certain information specified by the U.S. Department of Housing and Urban Development (HUD).

To make sure that the assistance is used properly, Federal laws require that the information you provide be verified. This information is verified in two ways:

1. HUD, O/As, and PHAs may verify the information you provide by checking with the records kept by certain public agencies (e.g., Social Security Administration (SSA), State agency that keeps wage and unemployment compensation claim information, and the Department of Health and Human Services (HHS) National Directory of New Hires (NDNH) database that stores wage, new hires, and unemployment compensation). HUD (only) may verify information covered in your tax returns from the U.S. Internal Revenue Service (IRS). You give your consent to the release of this information by signing form HUD-9887. Only HUD, O/As, and PHAs can receive information authorized by this form.

2. The O/A must verify the information that is used to determine your eligibility and the amount of rent you pay. You give your consent to the release of this information by signing the form HUD-9887, the form HUD-9887-A, and the individual verification and consent forms that apply to you. Federal laws limit the kinds of information the O/A can receive about you. The amount of income you receive helps to determine the amount of rent you will pay. The O/A will verify all of the sources of income that you report. There are certain allowances that reduce the income used in determining tenant rents.

   **Example:** Mrs. Anderson is 62 years old. Her age qualifies her for a medical allowance. Her annual income will be adjusted because of this allowance. Because Mrs. Anderson's medical expenses will help determine the amount of rent she pays, the O/A is required to verify any medical expenses that she reports.

   **Example:** Mr. Harris does not qualify for the medical allowance because he is not at least 62 years of age and he is not handicapped or disabled. Because he is not eligible for the medical allowance, the amount of his medical expenses does not change the amount of rent he pays. Therefore, the O/A cannot ask Mr. Harris anything about his medical expenses and cannot verify with a third party about any medical expenses he has.

### Customer Protections

Information received by HUD is protected by the Federal Privacy Act. Information received by the O/A or the PHA is subject to State privacy laws. Employees of HUD, the O/A, and the PHA are subject to penalties for using these consent forms improperly. You do not have to sign the form HUD-9887, the form HUD-9887-A, or the individual verification consent forms when they are given to you at your certification or recertification interview. You may take them home with you to read or to discuss with a third party of your choice. The O/A will give you another date when you can return to sign these forms.

If you cannot read and/or sign a consent form due to a disability, the O/A shall make a reasonable accommodation in accordance with Section 504 of the Rehabilitation Act of 1973. Such accommodations may include: home visits when the applicant's or tenant's disability prevents him/her from coming to the office to complete the forms; the applicant or tenant authorizing another person to sign on his/her behalf; and for persons with visual impairments, accommodations may include providing the forms in large script or braille or providing readers.

If an adult member of your household, due to extenuating circumstances, is unable to sign the form HUD-9887 or the individual verification forms on time, the O/A may document the file as to the reason for the delay and the specific plans to obtain the proper signature as soon as possible.

The O/A must tell you, or a third party which you choose, of the findings made as a result of the O/A verifications authorized by your consent. The O/A must give you the opportunity to contest such findings in accordance with HUD Handbook 4350.3 Rev. 1. However, for information received under the form HUD-9887 or form HUD-9887-A, HUD, the O/A, or the PHA, may inform you of these findings.

O/As must keep tenant files in a location that ensures confidentiality. Any employee of the O/A who fails to keep tenant information confidential is subject to the enforcement provisions of the State Privacy Act and is subject to enforcement actions by HUD. Also, any applicant or tenant affected by negligent disclosure or improper use of information may bring civil action for damages, and seek other relief, as may be appropriate, against the employee.

HUD-9887/A requires the O/A to give each household a copy of the Fact Sheet, and forms HUD-9887, HUD-9887-A along with appropriate individual consent forms. The package you will receive will include the following documents:

1. **HUD-9887/A Fact Sheet**: Describes the requirement to verify information provided by individuals who apply for housing assistance. This fact sheet also describes consumer protections under the verification process.

2. **Form HUD-9887**: Allows the release of information between government agencies.

3. **Form HUD-9887-A**: Describes the requirement of third party verification along with consumer protections.

4. **Individual verification consents**: Used to verify the relevant information provided by applicants/tenants to determine their eligibility and level of benefits.

### Consequences for Not Signing the Consent Forms

If you fail to sign the form HUD-9887, the form HUD-9887-A, or the individual verification forms, this may result in your assistance being denied (for applicants) or your assistance being terminated (for tenants). See further explanation on the forms HUD-9887 and 9887-A.

If you are an applicant and are denied assistance for this reason, the O/A must notify you of the reason for your rejection and give you an opportunity to appeal the decision.

If you are a tenant and your assistance is terminated for this reason, the O/A must follow the procedures set out in the Lease. This includes the opportunity for you to meet with the O/A.

### Programs Covered by this Fact Sheet

Rental Assistance Program (RAP)

Rent Supplement

Section 8 Housing Assistance Payments Programs (administered by the Office of Housing)

Section 202

Sections 202 and 811 PRAC

Section 202/162 PAC

Section 221(d)(3) Below Market Interest Rate

Section 236

HOPE 2 Home Ownership of Multifamily Units

---

O/As must give a copy of this HUD Fact Sheet to each household. See the Instructions on form HUD-9887-A.

# Notice and Consent for the Release of Information

to the U.S. Department of Housing and Urban Development (HUD) and to
an Owner and Management Agent (O/A), and to a Public Housing
Agency (PHA)

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

| HUD Office requesting release of information (Owner should provide the full address of the HUD Field Office, Attention: Director, Multifamily Division.): The Wannamaker Building 100 Penn Square east-12th Floor Philadelphia, PA 19107-3380 | O/A requesting release of information (Owner should provide the full name and address of the Owner.): 801 RESIDENCE, LP 801 LOCUST STREET PHILADELPHIA, PA 19107 | PHA requesting release of information (Owner should provide the full name and address of the PHA and the title of the director or administrator. If there is no PHA Owner or PHA contract administrator for this project, mark an X through this entire box.): PENNSYLVANIA HOUSING FINANCE AGENCY 211 NORTH FRONT STREET, HARRISBURG, PA 17105 |
|---|---|---|

**Notice To Tenant: Do not sign this form if the space above for organizations requesting release of information is left blank. You do not have to sign this form when it is given to you. You may take the form home with you to read or discuss with a third party of your choice and return to sign the consent on a date you have worked out with the housing owner/manager.**

**Authority**: Section 217 of the Consolidated Appropriations Act of 2004 (Pub L. 108-199). This law is found at 42 U.S.C.653(J). This law authorizes HHS to disclose to the Department of Housing and Urban Development (HUD) information in the NDNH portion of the "Location and Collection System of Records" for the purposes of verifying employment and income of individuals participating in specified programs and, after removal of personal identifiers, to conduct analyses of the employment and income reporting of these individuals. Information may be disclosed by the Secretary of HUD to a private owner, a management agent, and a contract administrator in the administration of rental housing assistance.

Section 904 of the Stewart B. McKinney Homeless Assistance Amendments Act of 1988, as amended by section 903 of the Housing and Community Development Act of 1992 and section 3003 of the Omnibus Budget Reconciliation Act of 1993. This law is found at 42 U.S.C. 3544.This law requires you to sign a consent form authorizing: (1) HUD and the PHA to request wage and unemployment compensation claim information from the state agency responsible for keeping that information; and (2) HUD, O/A, and the PHA responsible for determining eligibility to verify salary and wage information pertinent to the applicant's or participant's eligibility or level of benefits; (3) HUD to request certain tax return information from the U.S. Social Security Administration (SSA) and the U.S. Internal Revenue Service (IRS).

**Purpose:** In signing this consent form, you are authorizing HUD, the above-named O/A, and the PHA to request income information from the government agencies listed on the form. HUD, the O/A, and the PHA need this information to verify your household's income to ensure that you are eligible for assisted housing benefits and that these benefits are set at the correct level. HUD, the O/A, and the PHA may participate in computer matching programs with these sources to verify your eligibility and level of benefits. This form also authorizes HUD, the O/A, and the PHA to seek wage, new hire (W-4), and unemployment claim information from current or former employers to verify information obtained through computer matching.

**Uses of Information to be Obtained:** HUD is required to protect the income information it obtains in accordance with the Privacy Act of 1974, 5 U.S.C. 552a. The O/A and the PHA is also required to protect the income

information it obtains in accordance with any applicable State privacy law. After receiving the information covered by this notice of consent, HUD, the O/A, and the PHA may inform you that your eligibility for, or level of, assistance is uncertain and needs to be verified and nothing else.

HUD, O/A, and PHA employees may be subject to penalties for unauthorized disclosures or improper uses of the income information that is obtained based on the consent form.

**Who Must Sign the Consent Form:** Each member of your household who is at least 18 years of age and each family head, spouse or co-head, regardless of age, must sign the consent form at the initial certification and at each recertification. Additional signatures must be obtained from new adult members when they join the household or when members of the household become 18 years of age.

Persons who apply for or receive assistance under the following programs are required to sign this consent form:

Rental Assistance Program (RAP)

Rent Supplement

Section 8 Housing Assistance Payments Programs (administered by the Office of Housing)

Section 202; Sections 202 and 811 PRAC; Section 202/162 PAC Section

221(d)(3) Below Market Interest Rate

Section 236

HOPE 2 Homeownership of Multifamily Units

**Failure to Sign Consent Form:** Your failure to sign the consent form may result in the denial of assistance or termination of assisted housing benefits. If an applicant is denied assistance for this reason, the owner must follow the notification procedures in Handbook 4350.3 Rev. 1. If a tenant is denied assistance for this reason, the owner or managing agent must follow the procedures set out in the lease.

---

**Consent: I consent to allow HUD, the O/A, or the PHA to request and obtain income information from the federal and state agencies listed on the back of this form for the purpose of verifying my eligibility and level of benefits under HUD's assisted housing programs.**

Signatures:

| John Burnett | 3/23/22 | Additional Signatures, if needed: | |
|---|---|---|---|
| Head of Household | Date | Other Family Members 18 and Over | Date |
| | | | |
| Spouse | Date | Other Family Members 18 and Over | Date |
| | | | |
| Other Family Members 18 and Over | Date | Other Family Members 18 and Over | Date |
| | | | |
| Other Family Members 18 and Over | Date | Other Family Members 18 and Over | Date |

Original is retained on file at the project site

ref. Handbooks 4350.3 Rev-1, 4571.1, 4571/2 & 4571.3 and HOPE II Notice of Program Guidelines

form **HUD-9887** (02/2007)

## Agencies To Provide Information

State Wage Information Collection Agencies. (HUD and PHA). This consent is limited to wages and unemployment compensation you have received during period(s) within the last 5 years when you have received assisted housing benefits.

U.S. Social Security Administration (HUD only). This consent is limited to the wage and self employment information from your current form W-2.

National Directory of New Hires contained in the Department of Health and Human Services' system of records. This consent is limited to wages and unemployment compensation you have received during period(s) within the last 5 years when you have received assisted housing benefits.

U.S. Internal Revenue Service (HUD only). This consent is limited to information covered in your current tax return.

This consent is limited to the following information that may appear on your current tax return:

1099-S Statement for Recipients of Proceeds from Real Estate Transactions

1099-B Statement for Recipients of Proceeds from Real Estate Brokers and Barters Exchange Transactions

1099-A Information Return for Acquisition or Abandonment of Secured Property

1099-G Statement for Recipients of Certain Government Payments

1099-DIV Statement for Recipients of Dividends and Distributions

1099 INT Statement for Recipients of Interest Income

1099-MISC Statement for Recipients of Miscellaneous Income

1099-OID Statement for Recipients of Original Issue Discount

1099-PATR Statement for Recipients of Taxable Distributions Received from Cooperatives

1099-R Statement for Recipients of Retirement Plans W2-G

Statement of Gambling Winnings

1065-K1 Partner's Share of Income, Credits, Deductions, etc.

1041-K1 Beneficiary's Share of Income, Credits, Deductions, etc.

1120S-K1 Shareholder's Share of Undistributed Taxable Income Credits, Deductions, etc.

I understand that income information obtained from these sources will be used to verify information that I provide in determining initial or continued eligibility for assisted housing programs and the level of benefits.

No action can be taken to terminate, deny, suspend, or reduce the assistance your household receives based on information obtained about you under this consent until the HUD Office, Office of Inspector General (OIG) or the PHA (whichever is applicable) and the O/A have independently verified: 1) the amount of the income, wages, or unemployment compensation involved, 2) whether you actually have (or had) access to such income, wages, or benefits for your own use, and 3) the period or periods when, or with respect to which you actually received such income, wages, or benefits. A photocopy of the signed consent may be used to request a third party to verify any information received under this consent (e.g., employer).

HUD, the O/A, or the PHA shall inform you, or a third party which you designate, of the findings made on the basis of information verified under this consent and shall give you an opportunity to contest such findings in accordance with Handbook 4350.3 Rev. 1.

If a member of the household who is required to sign the consent form is unable to sign the form on time due to extenuating circumstances, the O/A may document the file as to the reason for the delay and the specific plans to obtain the proper signature as soon as possible.

This consent form expires 15 months after signed.

---

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect this information by the U.S. Housing Act of 1937, as amended (42 U.S.C. 1437 et. seq.); the Housing and Urban-Rural Recovery Act of 1983 (P.L. 98-181); the Housing and Community Development Technical Amendments of 1984 (P.L. 98-479); and by the Housing and Community Development Act of 1987 (42 U.S.C. 3543). The information is being collected by HUD to determine an applicant's eligibility, the recommended unit size, and the amount the tenant(s) must pay toward rent and utilities. HUD uses this information to assist in managing certain HUD properties, to protect the Government's financial interest, and to verify the accuracy of the information furnished. HUD, the owner or management agent (O/A), or a public housing agency (PHA) may conduct a computer match to verify the information you provide. This information may be released to appropriate Federal, State, and local agencies, when relevant, and to civil, criminal, or regulatory investigators and prosecutors. However, the information will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. You must provide all of the information requested. Failure to provide any information may result in a delay or rejection of your eligibility approval.

---

**Penalties for Misusing this Consent:**
HUD, the O/A, and any PHA (or any employee of HUD, the O/A, or the PHA) may be subject to penalties for unauthorized disclosures or improper uses of information collected based on the consent form.

Use of the information collected based on the form HUD 9887 is restricted to the purposes cited on the form HUD 9887. Any person who knowingly or willfully requests, obtains, or discloses any information under false pretenses concerning an applicant or tenant may be subject to a misdemeanor and fined not more than $5,000.

Any applicant or tenant affected by negligent disclosure of information may bring civil action for damages, and seek other relief, as may be appropriate, against the officer or employee of HUD, the Owner or the PHA responsible for the unauthorized disclosure or improper use.

---

# Release of Information

Verification by Owners of Information
Supplied by Individuals Who Apply for Housing Assistance

## Instructions to Owners

1. Give the documents listed below to the applicants/tenants to sign. Staple or clip them together in one package in the order listed.
   a. The HUD-9887/A Fact Sheet.
   b. Form HUD-9887.
   c. Form HUD-9887-A.
   d . Relevant verifications (HUD Handbook 4350.3 Rev. 1).

2. Verbally inform applicants and tenants that
   a. They may take these forms home with them to read or to discuss with a third party of their choice and to return to sign them on a date they have worked out with you, and
   b. If they have a disability that prevents them from reading and/ or signing any consent, that you, the Owner, are required to provide reasonable accommodations.

3. Owners are required to give each household a copy of the HUD9887/A Fact Sheet, form HUD-9887, and form HUD-9887-A after obtaining the required applicants/tenants signature(s). Also, owners must give the applicants/tenants a copy of the signed individual verification forms upon their request.

## Instructions to Applicants and Tenants

This Form HUD-9887-A contains customer information and protections concerning the HUD-required verifications that Owners must perform.

1. Read this material which explains:
   • HUD's requirements concerning the release of information, and
   • Other customer protections.
2. Sign on the last page that:
   • you have read this form, or
   • the Owner or a third party of your choice has explained it to you, and
   • you consent to the release of information for the purposes and uses described.

## Authority for Requiring Applicant's/Tenant's Consent to the Release of Information

Section 904 of the Stewart B. McKinney Homeless Assistance Amendments Act of 1988, as amended by section 903 of the Housing and Community Development Act of 1992. This law is found at 42 U.S.C. 3544.

In part, this law requires you to sign a consent form authorizing the Owner to request current or previous employers to verify salary and wage information pertinent to your eligibility or level of benefits.

In addition, HUD regulations (24 CFR 5.659, Family Information and Verification) require as a condition of receiving housing assistance that you must sign a HUD-approved release and consent authorizing any depository or private source of income to furnish such information that is necessary in determining your eligibility or level of benefits.  This includes

information that you have provided which will affect the amount of rent you pay. The information includes income and assets, such as salary, welfare benefits, and interest earned on savings accounts. They also include certain adjustments to your income, such as the allowances for dependents and for households whose heads or spouses are elderly handicapped, or disabled; and allowances for child care expenses, medical expenses, and handicap assistance expenses.

## Purpose of Requiring Consent to the Release of Information

In signing this consent form, you are authorizing the Owner of the housing project to which you are applying for assistance to request information from a third party about you. HUD requires the housing owner to verify all of the information you provide that affects your eligibility and level of benefits to ensure that you are eligible for assisted housing benefits and that these benefits are set at the correct levels. Upon the request of the HUD office or the PHA (as Contract Administrator), the housing Owner may provide HUD or the PHA with the information you have submitted and the information the Owner receives under this consent.

## Uses of Information to be Obtained

The individual listed on the verification form may request and receive the information requested by the verification, subject to the limitations of this form. HUD is required to protect the income information it obtains in accordance with the Privacy Act of 1974, 5 U.S.C. 552a. The Owner and the PHA are also required to protect the income information they obtain in accordance with any applicable state privacy law. Should the Owner receive information from a third party that is inconsistent with the information you have provided, the Owner is required to notify you in writing identifying the information believed to be incorrect. If this should occur, you will have the opportunity to meet with the Owner to discuss any discrepancies.

## Who Must Sign the Consent Form

Each member of your household who is at least 18 years of age, and each family head, spouse or co-head, regardless of age must sign the relevant consent forms at the initial certification, at each recertification and at each interim certification, if applicable. In addition, when new adult members join the household and when members of the household become 18 years of age they must also sign the relevant consent forms.

Persons who apply for or receive assistance under the following programs must sign the relevant consent forms:

Rental Assistance Program (RAP)
Rent Supplement
Section 8 Housing Assistance Payments Programs (administered by the Office of Housing)
Section 202
Sections 202 and 811 PRAC
Section 202/162 PAC
Section 221(d)(3) Below Market Interest Rate
Section 236
HOPE 2 Home Ownership of Multifamily Units

ref. Handbooks 4350.3 Rev-1, 4571.1, 4571.2 & 4571.3 and HOPE II Notice of Program Guidelines

form HUD-9887-A (02/2007)

**Failure to Sign the Consent Form**

Failure to sign any required consent form may result in the denial of assistance or termination of assisted housing benefits. If an applicant is denied assistance for this reason, the O/A must follow the notification procedures in Handbook 4350.3 Rev. 1. If a tenant is denied assistance for this reason, the O/A must follow the procedures set out in the lease.

**Conditions**

No action can be taken to terminate, deny, suspend or reduce the assistance your household receives based on information obtained about you under this consent until the O/A has independently 1) verified the information you have provided with respect to your eligibility and level of benefits and 2) with respect to income (including both earned and unearned income), the O/A has verified whether you actually have (or had) access to such income for your own use, and verified the period or periods when, or with respect to which you actually received such income, wages, or benefits.

A photocopy of the signed consent may be used to request the information authorized by your signature on the individual consent forms. This would occur if the O/A does not have another individual verification consent with an original signature and the O/A is required to send out another request for verification (for example, the third party fails to respond). If this happens, the O/A may attach a photocopy of this consent to a photocopy of the individual verification form that you sign. To avoid the use of photocopies, the O/A and the individual may agree to sign more than one consent for each type of verification that is needed. The O/A shall inform you, or a third party which you designate, of the findings made on the basis of information verified under this consent and shall give you an opportunity to contest such findings in accordance with Handbook 4350.3 Rev. 1.

The O/A must provide you with information obtained under this consent in accordance with State privacy laws.

If a member of the household who is required to sign the consent forms is unable to sign the required forms on time, due to extenuating circum-

stances, he/she must sign as soon as possible and must give the reason for the delay and the specific plans to obtain the proper signature as soon as possible.

Individual consents to the release of information expire 15 months after they are signed. The O/A may use these individual consent forms during the 120 days preceding the certification period. The O/A may also use these forms during the certification period, but only in cases where the O/A receives information indicating that the information you have provided may be incorrect. Other uses are prohibited.

The O/A may not make inquiries into information that is older than 12 months unless he/she has received inconsistent information and has reason to believe that the information that you have supplied is incorrect. If this occurs, the O/A may obtain information within the last 5 years when you have received assistance.

**I have read and understand this information on the purposes and uses of information that is verified and consent to the release of information for these purposes and uses.**

John Burnett
_____
Name of Applicant or Tenant (Print)

_____ 5/23/22
Signature of Applicant or Tenant & Date

**I have read and understand the purpose of this consent and its uses and I understand that misuse of this consent can lead to personal penalties to me.**

Nateisha Simmons
_____
Name of Project Owner or his/her representative

Certification Specialist
_____
Title

_____ 5/23/2
Signature & Date
cc:Applicant/Tenant
Owner file

**Penalties for Misusing this Consent:**

HUD, the O/A, and any PHA (or any employee of HUD, the O/A, or the PHA) may be subject to penalties for unauthorized disclosures or improper uses of information collected based on the consent form.

Use of the information collected based on the form HUD 9887-A is restricted to the purposes cited on the form HUD 9887-A. Any person who knowingly or willfully requests, obtains or discloses any information under false pretenses concerning an applicant or tenant may be subject to a misdemeanor and fined not more than $5,000.

Any applicant or tenant affected by negligent disclosure of information may bring civil action for damages, and seek other relief, as may be appropriate, against the officer or employee of HUD, the O/A or the PHA responsible for the unauthorized disclosure or improper use.

Original is retained on file at the project site | ref. Handbooks 4350.3 Rev. 1, 4571.1, 4571.2 & 4571.3 and HOPE II Notice of Program Guidelines | form **HUD-9887-A** (02/2007)

**801 Residence/ American Postal Workers House**
**801 Locust Street**
**Philadelphia, PA 19107**
**215-925-9090**
**Fax: 215-925-9091**
**TTY# 800-654-5984**



I _____Burnett_____ acknowledge receipt of:

- Resident Rights and Responsibilities Handbook
- HUD 9887 & 9887A Notice and Consent for the Release of Information
- Fact Sheet "How Your Rent Is Determined"
- Is Fraud Worth It form,
- EIV & You Brochure from the Department of Housing and Urban Development (HUD)
- Pet Policy

_John Burnett_

Signature of Head of Household

_5/23/22_

Date

_____

Signature of Spouse/Co-Head/Other

_____

Date

_316_

Unit #

CC:    Tenant/Tenant file

# **Exhibit E**
## Photograph of (Blue) Motorized Scooter





Elevator1 of 3 (inside)

Exhibit Taken 9/28/19





# Exhibit F
Email dated 01/04/2019, from Defendant Joseph BERGER, Property Manager



Thanks,

JBurnett

On Jan 4, 2019, at 4:41 PM, Manager - 801 <801Manager@bergercos.com> wrote:

Good Afternoon Mr. Burnett,

Please see my attached response to your letter. I will also be hand delivering you a hard copy of this letter.

I will be in touch with you to reschedule your Reasonable Accommodation meeting regarding moving your apartment down the hall closer to the elevators, per your request.

Thank you,
Joseph Berger

-----Original Message-----
From: Manager - 801
Sent: Thursday, December 27, 2018 12:38 PM
To: 'Jay Burnett' <johnburnett585@gmail.com>
Cc: Manager - 801 <801Manager@bergercos.com>
Subject: RE: Incident Regarding Security Officer CJ Han

Good Afternoon Mr. Burnett,

I have received your email and I am currently working on my reply to your complaint. I will now return your call that you placed today @ 11:11am.

Thank you,

Joseph

-----Original Message-----
From: Jay Burnett <johnburnett585@gmail.com>
Sent: Monday, December 24, 2018 4:58 PM
To: Manager - 801 <801Manager@bergercos.com>
Subject: Incident Regarding Security Officer CJ Han
Importance: High

Good afternoon Mr. Berger,

I am corresponding with you regarding the unprofessional and possible life threatening conduct of your security officer CJ Han, on the early morning of Sunday, December 23, 2019 at approximately 4:45am, I placed a called to the security desk to request that the freight elevator be summoned to the 3rd floor, at which time the officer asked me why I needed the freight elevator, are you moving something, I said no I am not in addition to informing him that I needed it for transport purposes to the ground floor in order to attend my dialysis session, I preceded to wait at the elevator for the next 15 to 20 minutes until a woman just so happen to exit the requested elevator, once I reached the ground floor I asked the officer why didn't he send the elevator as I requested and I observed that he never

7/10/2019



CITY OF PHILADELPHIA
COMMISSION ON HUMAN RELATIONS

RECEIVED

SEP 0 5 2019

BY: ⚓

JOHN BURNETT,
    Complainant

v.

PCHR CHARGE NO. 2019-07-31-1931

AMERICAN POSTAL WORKERS HOUSE
ASSOCIATES,
    Respondent

## COMPLAINT

### INTRODUCTION AND PARTIES

1. This is my complaint of discrimination in housing and real property.

2. This complaint involves actions that were taken against me, John Burnett. I live at the following address: 801 Locust Street, Apt. 316, Philadelphia, PA 19107.

3. This complaint involves actions that were taken by American Postal Workers House Associates; its address is: 114 Forrest Avenue, Suite 100, Narberth, PA 19072.

4. My relationship with the Respondent began on September 1, 2017 and continues through present. During the relevant time period, I was a tenant of the Respondent.

### JURISDICTION

5. The conduct took place within the city of Philadelphia at the following address: 801 Locust Street, Apt. 316, Philadelphia, PA 19107.

6. The Respondent is covered by the Philadelphia Fair Practices Ordinance.

7. The actions taken against me occurred less than 300 days ago.

### COMPLAINT OF DISCRIMINATION

#### Count I: Denial of Reasonable Accommodation

8. Respondent denied me a reasonable accommodation on January 4, 2019.

9. I have a mobility impairment. I use a motorized chair.

10. Respondent denied me a reasonable accommodation on the basis of my disability.

11. The facts that show Respondent denied me a reasonable accommodation on the basis of my disability are as follows:

# Exhibit G
PCHR Complaint, filed September 5, 2019

a. When I first began using a motorized chair around summer 2018, Respondent's Property Manager Joseph Berger verbally permitted me to use the building's freight elevator to accommodate the size of my chair.

    i. Mr. Berger was aware of my disability, as it is visible.

    ii. My chair does not fit into the property's two smaller resident elevators. It is too wide to easily fit through the doors, and too long for the doors to close. Mr. Berger has seen this for himself.

    iii. Mr. Berger has suggested that I remove the storage basket in order to use the smaller elevators. The basket came affixed to the chair by the manufacturer and is necessary for me to perform daily activities. Furthermore, the chair would not fit even if the basket were removed.

b. On December 23, 2018, I called Respondent's security desk and requested that the guard on duty, C.J. Han, send the freight elevator to my floor so I may exit the building for a scheduled renal treatment. Mr. Han asked if I was moving something, to which I responded that I needed the elevator for transport purposes.

c. After waiting for 15-20 minutes, I was able to take the freight elevator to the lobby only after another resident exited on my floor. Mr. Han's inaction caused me to be late for my renal treatment, which threatened my health and safety.

d. On December 24, 2018, I reported to Mr. Berger via email that Mr. Han failed to send the freight elevator to my floor upon request.

e. On January 4, 2019, Mr. Berger responded to my email with a letter stating that I had been permitted to use the freight elevator on a temporary basis, and that "the courtesy that had been extended to [me] will end with the receipt of this letter."

f. My residence, Unit 316, is at the far end of the hallway relative to the elevator.

g. I began requesting a reasonable accommodation to allow me to transfer to a unit closer to the elevators around summer 2018, when I became more severely mobility impaired.

    i. My doctor, Emma Lundsmith, recommended that I move to a unit closer to an elevator to be better able to practice walking in order to improve my mobility.

h. I submitted doctor's notes from Dr. Lundsmith to Respondent on two occasions in late 2018.

i. Each time I submitted requested documentation to Respondent in order to have my accommodation approved, Mr. Berger requested additional documents. Mr. Berger continued to request documents from my doctor, which I had already submitted, until April 2, 2019, most recently. By presenting an unreasonable number of obstacles to obtaining my request, Respondent effectively denied my request for a reasonable accommodation.

## REQUEST FOR RELIEF

12. As a result of the Respondent's discrimination, I have suffered damages and request the Respondent compensate, reimburse, and provide any and all appropriate relief including but not limited to all benefits I would have received had it not been for Respondents' illegal actions.

13. I wish to be awarded punitive damages as permitted by applicable law in an amount believed by the Commission to be appropriate to punish Respondents for their willful, deliberate, malicious, and outrageous conduct and to deter Respondents or other employers from engaging in such misconduct in the future.

14. I wish to be awarded the costs and expenses of this action as provided by applicable federal and state law.

## CONCLUSION

15. I have not filed a complaint about the actions described here with the Pennsylvania Human Relations Commission.

16. I hereby authorize the Philadelphia Commission on Human Relations to serve this complaint upon the Respondent, investigate my complaint and the facts related thereto, and to file my complaint under the laws of the U.S. Equal Employment Opportunity Commission, if applicable.

17. I request that my file be reviewed under all applicable laws enforced by the Commission to satisfy the procedural and administrative requirements for proceeding under federal or state laws should it become necessary.

I declare under penalty of perjury that all of the information that I have provided in this complaint is true, correct, and complete to the best of my knowledge, I acknowledge that false statements on this complaint are punishable by state law, 18 Pa. C.S. § 4904 (unsworn falsification to authorities).

9/5/19
_____
DATE

_____
JOHN BURNETT

# Exhibit G-1
## PCHR Complaint, Withdrawn January 28, 2020

**G-1**

# PHILADELPHIA COMMISSION ON HUMAN RELATIONS

## DISMISSAL AND NOTICE OF RIGHTS

**To:**

John Burnett
801 Locust Street
Philadelphia, PA 19107

From:
Philadelphia Commission on Human Relations
601 Walnut Street, Suite 300 South
Philadelphia, PA 19106
215-686-4670 (p) 215-686-4684(f)

**PCHR Complaint No.: 2019-07-31-1931**　　　　　**Date of Commission Decision: 1/17/2020**

### Re: John Burnett v. American Postal Workers House Associates

The Philadelphia Commission on Human Relations is closing its file on this complaint for the following reasons

☐ **Charge Not Substantiated** – The PCHR is unable to conclude that the information obtained through our investigation establishes a violation of the Philadelphia Fair Practices Ordinance. This does not certify that *the Respondent is* in compliance with the Philadelphia Fair Practices Ordinance. No finding is made as to any other issues that might be construed as having been raised by this complaint.

☐ **Failure to Cooperate** – After 30 days in which to respond, the Complainant failed to provide information, failed to appear or to be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve the complaint.

☐ **Failure to Locate** – Though reasonable efforts were made to locate the Complainant, we were not able to do so.

☒ **Complaint Withdrawn** – The PCHR has complied with the Complainant's request for withdrawal of the complaint referenced above.

☐ **Lack of Jurisdiction** – The facts alleged in the complaint fail to state a claim over which the PCHR has enforcement authority because the Complainant waited too long after the date(s) of the alleged discrimination to file the complaint, the discrimination alleged occurred outside Philadelphia or for some other reason(s).

☐ **Satisfactorily Adjusted** – The parties entered a settlement agreement that provides relief for the harm(s) alleged.

☐ **Waiver to EEOC** – The Complainant has requested that the case be waived to the Equal Employment Opportunity commission for further processing.

☐ **Right to Sue Requested** – Notice received that a right to sue was requested from the EEOC in this dual-filed matter. Complainant has the right to pursue this claim in the appropriate state or federal court.

☐ **Conciliation** – After a finding of probable cause, the parties entered a conciliation agreement that provides full relief for the violations established by our investigation. The complaint will be closed accordingly, but the Conciliation Agreement will remain on file and subject to review by the Commission during the period it is in effect.

☐ **Other** – Charge Substantiated.

No further action is required at this time.

On behalf of the Commission

_____　　　　　1 - 28 - 20

**Name**　　　　　　　　　　　　　　　　　**Date**

# Exhibit H
## HUD Complaint, filed December 2, 2019





**U.S. Department of Housing and Urban Development**
Philadelphia Office
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19107-3380

December 9, 2019

John Burnett
801 Locust Street, Apt. 316
Philadelphia, PA 19107

Dear Complainant:

Subject:       Housing Discrimination Complaint
               Burnett, John v. American Postal Workers House Associates, et al.
               HUD File No.: 03-20-4033-8
               Section 504 Case No.: 03-20-4033-4

Your complaint, alleging one or more discriminatory housing practices, was officially filed on December 02, 2019 as a complaint under the Federal Fair Housing Law, 42 U.S.C. Sections 3601-3619. For your records, we are enclosing a copy of your complaint, and, as required by law, a copy has been sent to the respondent(s).

The respondent organization is a recipient of Federal financial assistance, and the complaint has been accepted and will be investigated under Section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794] as amended. The Act states:

No otherwise qualified individual with handicaps in the United States...shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The purpose of this letter is to inform you of: 1) the rights you have during the processing of this complaint, 2) the rights each respondent has in responding to this complaint, and 3) the steps the U.S. Department of Housing and Urban Development (the Department) will take to determine whether the complaint has merit.

In order to ensure that the Department informs you properly of the law's requirements, this notification letter contains language required by the law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department under the Federal Fair Housing Law.

We are governed by federal law, which sets out what steps we must take when a formal complaint is filed. The law also includes steps that each respondent can take to answer or refute the allegations of this complaint.



Under federal law, a respondent can file an answer to this complaint or any amendment made to this complaint within 10 calendar days of receipt of the Department's notification letter to him or her. Each respondent's answer must be signed and affirmed that the response is truthful by including the statement "I declare under penalty of perjury that the foregoing is true and correct." A respondent can, with the agreement of the Department, amend his or her answer at any time during the investigation.

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the respondent(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the respondent(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the respondent(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Under federal law, even if the Department dismisses the complaint, you still have the right to bring an individual suit under the Federal Fair Housing Law. You may file your lawsuit in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department. You also have the legal right to file a lawsuit in court, even if your complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge.

There may be other applicable federal, state or local statutes under which you and/or the respondent(s) may initiate court action. You may consult a private attorney in this regard.



The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for a respondent or anyone else to coerce, intimidate, threaten, or interfere with you in your exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law. The law also makes it illegal for anyone to coerce, threaten or interfere with you for your having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

If you have any questions regarding this case, please do not contact the undersigned, instead please contact Rachel Leith, Enforcement Branch Chief at 410-209-6548 or Rachel.l.leith@hud.gov. Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Melody Taylor
Director, Region III
Office of Fair Housing and Equal Opportunity

Enclosure

cc:     Sterling Johnson
        Fair Housing Rights Center
        444 N. 3rd Street, Suite 110
        Philadelphia, PA 19123



## Housing Discrimination Complaint

**Case Number:**

**1.    Complainants:**

John Burnett
American Postal Workers House
801 Locust Street, Apt. 316
Philadelphia, PA 19107
Represented By: Fair Housing Rights Center

**2.    Complainant Representatives:**

Sterling Johnson
Fair Housing Rights Center
444 N. 3rd Street, Suite 110
Philadelphia, PA 19123
Representing: Burnett, John

**3.    Other Aggrieved Parties:**

N/a

**4.    The following is alleged to have occurred or is about to occur:**

- Discriminatory terms, conditions, privileges, or services and facilities
- Otherwise deny or make housing unavailable
- Discriminatory acts under Section 818 (retaliation/harassment)
- Failure to make reasonable accommodation

**5.    The alleged violation occurred because of:**

- Disability
- Retaliation

**6.    Address and location of the property in question (or if no property is involved, the city and state where the discrimination occurred):**

American Postal Workers House
801 Locust Street, Apt. 316
Philadelphia, PA 19107

**7.    Respondents:**



American Postal Workers House Associates (Property Owner)
American Postal Workers House
114 Forrest Avenue
Narberth, PA 19072

Berger Associates, LLC (Management)
American Postal Workers House
114 Forrest Avenue
Narberth, PA 19072

8.     **The following is a brief and concise statement of the facts regarding the alleged violation:**

Complainant alleges Respondents violated 804(f)(1)(A), 804(f)(2)(A) and 804(f)(3)(B)
of the Fair Housing Amendments Act of 1988 (the Act) because of his disability.
Complainant further alleges Respondents violated 818 when Respondents retaliated
against him.

Alleged violation of 804(f)(1)(A) – Otherwise deny or make housing unavailable
because of disability, 804(f)(2)(A) - Discriminatory terms, conditions, privileges, or
services and facilities because of disability and 804(f)(3)(B) - Failure to make
reasonable accommodation because of disability

Complainant is a person with a disability as defined by the Act.

Complainant alleges on or about December 20, 2018, he requested Respondents for
permission to use the freight elevator and to transfer to an apartment closer to the
freight elevator as a reasonable accommodation for his disability.

Complainant alleges he submitted medical documentation to the Respondents on
multiple occasion to verify his disability and to demonstrate a clear and direct nexus
between his disability and the medically-related need to use the freight elevator and to
transfer to an apartment closer to the freight elevator.

Complainant alleges on or about December 20, 2018 and January 4, 2019, Respondents
agent emailed Complainant to inform him that he will be in touch with Complainant to
schedule a meeting to discuss Complainant's reasonable accommodation request.

Complainant alleges the meeting to discuss his reasonable accommodation request
never materialized and thus Respondents never accommodated his disability to this
day.



Complainant alleges Respondents otherwise denied or made housing unavailable
because he is not able to use and enjoy the subject dwelling without the requested
reasonable accommodation.

Complainant alleges the requested reasonable accommodation is necessary to afford him an equal opportunity to use and enjoy the subject dwelling because of his disability.

Alleged violation of 818 – Retaliation and harassment because of a protected activity

Complainant alleges on or about January 4, 2019, and June 17, 2019 Respondents issued him lease violation notices for threatening and harassing management staff to retaliate and harass him because he requested reasonable accommodation for his disability. Complainant alleges on or about July 30, 2019, Respondents filed suit to evict him to retaliate and harass him because he requested reasonable accommodation for his disability.

Complainant alleges he did not threaten or harass management staff and the eviction lawsuit was dismissed by the Court.

Alleged violation of Section 504 of the Rehabilitation Act of 1973

Complainant alleges Respondents failed to make a reasonable accommodation for his disability and as such Respondents violated Section 504 of the Rehabilitation Act of 1973 because Respondents are recipients of Federal financial assistance.

**9.     The most recent date on which the alleged discrimination occurred:**

July 30, 2019, and is continuing.

**10.    Types of Federal Funding Identified:**

- HUD Assisted Housing (202, 811, Project Based Section 8)

**11.    The acts alleged in this complaint, if proven, may constitute a violation of the following sections:**

804(f)(1)(A), 804(f)(2)(A), 804(f)(3)(B) and 818 of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Amendments Act of 1988.

Section 504 of the Rehabilitation Act of 1973

**Please sign and date this form:**



I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.

John Burnett                          Date    12/02/19

N O T E: HUD WILL FURNISH A COPY OF THIS COMPLAINT TO THE PERSON OR ORGANIZATION AGAINST WHOM IT IS FILED.



2960 Pelham Parkway #249
Birmingham AL 35124

## USPS CERTIFIED MAIL



9314 8000 3860 0219 5729 89

00000001 2 0.65

HEMS
00000001

IMPORTANT HUD NOTICE

JOHN BURNETT
801 LOCUST ST APT 316
PHILADELPHIA PA 19107-5523



# **Exhibit H-1**
## HUD Complaint, dismissed on June 5, 2020

# H-1

## **DETERMINATION OF NO REASONABLE CAUSE**

Case Name: Burnett, John v. American Postal Workers House Associates, et al.

Case Number: 03-20-4033-8, 03-20-4033-4

### **I.    Jurisdiction:**

Complainant John Burnett alleges he was discriminated against by Respondents American Postal Workers House Associates and Berger Associates, LLC because of his disability. Complainant alleges after asserting his fair housing rights to Respondents in December 2018, Respondents subjected him to retaliation by giving him lease violations based on false allegations and tried to evict him from the subject property. Respondent American Postal Workers House Associates owns American Postal Workers House (APWH), and Berger Associates, LLC is the management entity for APWH.

The subject property is a multi-family development consisting of three hundred (300) apartments located at 801 Locust Street, Philadelphia, PA and neither the subject property or Respondents are exempt under Section 803 or 807 of the Fair Housing Act (the Act). If proven, Respondents' alleged actions would violate subsections 804(f)(1), 804(f)(2)(A), 804(f)(3)(B), and 818 of Title VIII of the Civil Rights Act of 1968, and Section 504 of the Rehabilitation Act of 1973. Section 804(f)(1) of the Act makes it illegal to discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a disability of that buyer or renter. Section 804(f)(2) makes it illegal to discriminate in the terms and conditions of a rental because of disability, including a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling (Section 804(f)(3)(B)). Section 818 of the Act makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed rights protected by the Fair Housing Act. Section 504 provides that no qualified individual with a disability shall, solely because of disability, be excluded from participation in, be denied the benefit of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department.

The last date of alleged discrimination occurred on November 14, 2019 and the complaint was timely filed on December 02, 2019.

Respondents receive federal financial assistance through HUD's Office of Multifamily Housing, and the subject property is a recipient of a HUD Project Based Voucher.

### **II.    Complainant's Allegations**:

Complainant alleges he was discriminated against by the Respondents because of his disability. Specifically, Complainant alleges that on the morning of December 23, 2018, he called APWH's front desk to bring the freight elevator to his floor so he could go to his dialysis appointment. Complainant alleges Respondents' security guard refused to send the freight elevator to his floor, causing him to be late to his dialysis appointment. Complainant alleges that after he reported

what had occurred, Respondents issued him a lease violation based on fabricated allegations that he made racial slurs against the security guard. Complainant asserts he only expressed his unhappiness to Respondents' security guard about his refusal to call the freight elevator to his floor and never made any reference to the security guard's Asian heritage. Complainant asserts he must use the freight elevator in his building because that is the only elevator in which his scooter will fit. On or around January 7, 2019, Complainant alleges he made a reasonable accommodation request to move to a unit closer to the elevator. Complainant stated he gave Respondents medical documentation to support his need for a unit transfer, and Respondents refused to grant his request to move to a unit closer to the elevator. Complainant alleges Respondents then tried to evict him based on false allegations that he threatened violence and made homophobic statements to APWH's then-property manager Joseph Berger.

## III. Respondents' Defenses

The Respondents deny discriminating against the Complainant because he is a person with a disability. Respondents assert they issued Complainant lease violations and took actions to evict him based on legitimate non-discriminatory reasons. Respondents state their accommodation to have their staff bring the freight elevator to Complainant's floor whenever he requested it was only a temporary accommodation because Complainant was initially having trouble maneuvering his scooter. Respondents assert that having their staff bring the freight elevator to Complainant every time he requested it would be a fundamental alteration of their program. Respondents assert that on December 23, 2018, Complainant made racial slurs against an Asian-American security guard at APWH, and that was why they issued Complainant a lease violation.  On January 7, 2019, Respondents assert they received a written reasonable accommodation request from Complainant requesting to move into a unit closer to the elevator. Respondents allege that since there was not a nexus between Complainant's disability and his reasonable accommodation request, they engaged in the interactive process and asked Complainant to submit additional medical documentation to support his need for a unit transfer. Respondents assert Complainant never provided any medical documentation to support his need for a unit transfer. Respondents assert they took actions to evict Complainant from his unit for legitimate non-discriminatory reasons. Respondents assert in June 2019, Complainant threatened violence against then property manager Joseph Berger and made homophobic statements against Mr. Berger. Respondents assert they determined that Complainant posed a danger to the tenants and staff at APWH and accordingly they decided to pursue an eviction against Complainant.

## IV. Findings

Complainant John Burnett moved into unit #316 at APWH on September 1, 2017.

On December 12, 2017, APWH staff wrote an incident report because it was reported to them that Complainant slapped and then choked his stepson.

On December 18, 2017, Complainant received a Notice of Lease Violation for having unauthorized occupants living with him.

Sometime in 2018, Complainant started a using a scooter for mobility purposes. Respondents granted Complainant an accommodation to have APWH staff send the freight elevator to Complainant's floor whenever Complainant requested the elevator.

On April 26, 2018, Complainant received a Notice of Lease Violation for threatening to commit physical violence against APWH's security supervisor.

On December 23, 2018, Complainant called APWH's front desk and requested the freight elevator be sent to his floor. The front desk security officer never sent the freight elevator to Complainant's floor.

On December 24, 2018, Complainant sent an email to then-APWH property manager Joseph Berger to report that on the previous day, APWH's security guard on duty refused to send the freight elevator to Complainant's floor.

On January 4, 2019, Complainant received a Notice of Lease Violation for screaming racial slurs at APWH staff on December 23rd and 24th.

On January 4, 2019, APWH's property manager Joseph Berger sent a letter to Complainant stating that the accommodation to have APWH staff send the freight elevator to his floor whenever he requested it was a temporary accommodation. Mr. Berger stated that Respondents will no longer send the freight elevator to Complainant.

On January 7, 2019, Complainant made a reasonable accommodation request for a unit transfer. Complainant wrote: "I John Burnett requests [SIC] a reasonable Accommodation [SIC] to the center hallway area which would facilitate continued theraputic [SIC] exercise and would enhance my rehab accordingly! J Burnett." Complainant asserts his medical provider provided Respondents a doctor's note regarding Complainant's need for a unit transfer. Respondents assert they never received any additional documentation from Complainant's medical provider.

In or around April 2019, Respondents' then-property manager Joseph Berger sent Complainant a letter stating he would like to meet Complainant on April 11, 2019 to further discuss Complainant's reasonable accommodation request for a unit transfer. Respondents assert Complainant never responded to the meeting request. Complainant stated in his interview with the assigned HUD investigator that while he does not remember receiving this notice, he was not going to have any further meetings with Mr. J. Berger.

On June 13, 2019, APWH's assistant property manager wrote a written statement to report that Complainant called her that day and made homophobic statements about APWH's property manager and threatened physical violence against him.

On June 14, 2019, Philadelphia Police were called to the subject property by Respondents because Complainant allegedly refused to leave APWH's property manager's office.

On June 17, 2019, Complainant received a Notice of Lease Violation and an eviction notice for allegedly threatening to commit violence against APWH staff on June 13th and June 14th. Complainant appealed the decision to evict him.

On June 19, 2019, a meeting was held to consider Complainant's appeal request to overturn his eviction. At the hearing were the following individuals: Complainant, Complainant's brother, Thomas Burnett, Respondents' owner, Robert Berger, and Darryl Green, APWH's maintenance supervisor.

On June 28, 2019, Respondents' owner, Robert Berger, sent Complainant a letter denying Complainant's request to reverse Respondents' eviction action against him. The letter states Complainant must leave the subject property by July 17, 2019.

On July 23, 2019, Complainant received a letter from Respondents' attorney, Kenneth Baritz. The letter stated Complainant had 30 days to vacate the subject property, and Respondents will immediately file a landlord-tenant action against Complainant.

On July 26, 2019, Respondents' assistant manager wrote a written statement that Complainant called her that day and threatened physical violence against APWH's property manager, Joseph Berger.

On November 14, 2019, a landlord-tenant hearing was held in Philadelphia Municipal Court. Respondents pursued this action in municipal court to petition the Court to evict Complainant from the subject property. The case was dismissed by the Court.

## **Failure to make a Reasonable Accommodation Under Section 804(f)(3)(b) of the Act by Discriminating against a Person in the Terms, Conditions or Privileges of the Rental of a Dwelling or Making a Dwelling Unavailable.**

Complainant alleges Respondents denied his reasonable accommodation to send the freight elevator to his floor and to be transferred to a unit closer to the elevator. A prima facie case of a reasonable accommodation claim under the Act consists of the following elements:

1. The Complainant is a person with a disability.
2. The Respondent knew or reasonably should have known that the Complainant was a person with a disability.
3. The Complainant requested a reasonable accommodation in the rules, policies, practices, or services of the Respondent.
4. The requested accommodation may be necessary to afford the Complainant an equal opportunity to use and enjoy the dwelling.
5. The Respondent refused the Complainant's request to make such accommodation or failed to respond or delayed responding to the request such that it amounted to a denial.
6. The Respondents' refusal made housing unavailable to the Complainant

The evidence has not satisfied elements four (4) and six (6) of the prima facie elements.

### Use of the Freight Elevator

The investigation determined that from the time Complainant got his scooter up until December 23, 2018, Respondents' staff would send the freight elevator to Complainant's floor and assist Complainant with safely getting into the elevator. The investigation has determined that Respondents have never denied Complainant access to the freight elevator. Respondents have only refused to devote its own resources and time to bring the freight elevator every time Complainant requests to use it. Complainant is permitted to use the freight elevator at any time, and can call for the freight elevator any time he chooses. In his interview with the assigned HUD investigator, Complainant was unable to provide any instances in which he was unable to leave or get back to his floor since Respondents stopped sending the freight elevator to his floor upon request.

### Unit Transfer Request

Complainant made a written reasonable accommodation request to move to a unit closer to the elevator on January 7, 2019. Respondents engaged in the interactive process and requested additional medical documentation from Complainant's medical provider. In April 2019, the investigation determined that Mr. J. Berger requested an additional meeting with Complainant to further discuss Complainant's reasonable accommodation for a unit transfer and Complainant never attended the meeting. The investigation was unable to substantiate whether Respondents ever received a doctor's note or any medical documentation supporting Complainant's need to move to a unit closer to the elevator.

## Making Housing Unavailable

In order to establish a prima facie case of disability discrimination in violation of 804(f)(1) of the Act, the evidence must satisfy the following prima facie elements:

1. The Complainant is a member of a protected class.
2. The Complainant was the Respondent's tenant.
3. The Respondent acted to terminate the complainant's tenancy.
4. The Respondent did not take similar action against a tenant of a different protected class.

To show discrimination, the Complainant has the burden of proving a prima facie case of discrimination by preponderance of the evidence. Second, if the Complainant sufficiently establishes a prima facie case, the burden shifts to the Respondent to articulate a legitimate nondiscriminatory reason for its action. Third, if the Respondent satisfies this burden, the Complainant may prove by a preponderance of evidence that the legitimate reasons asserted by the Respondent are actually mere pretext.

Although the Complainant alleged a prima facie case, the Respondents have articulated a legitimate nondiscriminatory reason for taking eviction actions against Complainant in June

2019. Complainant received multiple lease violations for making racist and homophobic statements and threatening violence against APWH staff. In April 2018, Complainant was given a lease violation for threatening physical violence against APWH's security supervisor. On January 4, 2019, Complainant received a lease violation for making racial slurs against an Asian-American security guard at APWH. On June 13, 2019, APWH's assistant manager wrote a statement that Complainant called her and made homophobic statements about APWH's property manager. There were multiple witnesses who reported that Complainant made homophobic statements to APWH's property manager. On June 14, 2019, the Philadelphia Police were called to the subject property because Complainant allegedly refused to leave APWH's property manager's office. On July 26, 2019, Respondents' assistant manager wrote a written statement that Complainant made homophobic statements to her about APWH's property manager and threatened physical violence against him. Complainant did not offer sufficient evidence to prove by a preponderance of the evidence that the reason for the eviction cited by Respondents was pretext for discrimination based on Complainant's disability.

## Coercion, Intimidation, Threats, Interference - Retaliation

To prevail in a complaint of retaliation under Section 818 of the Act, Complainant would need to prove the following:

1. The Complainant engaged in an activity protected by the Act.
2. The Respondent subjected the Complainant to an adverse action.
3. Circumstantial evidence exists of a causal link between the protected activity and adverse action.

The evidence has not satisfied element three (3) of the prima facie elements. As noted above, the investigation determined that Respondents had a legitimate non-discriminatory reason for issuing Complainant lease violations and taking eviction actions against Complainant. The investigation did not find any evidence to support a link between Complainant's reasonable accommodation requests and Respondents' actions to evict.

### V.    Conclusion

Based on the evidence gathered, the Department has concluded that there is no reasonable cause to believe that Respondents American Postal Workers House Associates or Berger Associates, LLC  discriminated against Complainant John Burnett on the basis of disability in violation of Sections 804(f)(1), 804(f)(2)(a), 804(f)(3)(b), and 818 of the Act or Section 504 of the Rehabilitation Act of 1973. This determination only addresses the violations of the Act alleged in the complaint and does not address any potential violations of any other provision of law.

### VI.    Additional Information

Notwithstanding this determination by HUD, the Act provides that the Complainant may file a civil action in an appropriate federal district court or state court within two years after the

occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period does not include the time during which this administrative proceeding was pending. In addition, upon the application of either party to such civil action, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil action without the payment of fees, costs, or security, if the court determines that such party is financially unable to bear the costs of the lawsuit.

Pursuant to 24 C.F.R § 8.56(h), a party may request a review of the Section 504 preliminary findings within thirty (30) days of receipt of this letter by mailing or delivering such request, in writing to: Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W., Washington, DC  20410. If neither party requests review, the above findings shall constitute the Department's formal determination of compliance.

The Department's regulations implementing the Act require that a dismissal, if any, be publicly disclosed, unless the Complainant or Respondent requests that no such disclosure be made. 24 CFR 103.400(a)(2)(ii).  Such request must be made within thirty (30) days of receipt of the determination to Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W., Washington, DC  20410. Notwithstanding such request by the Respondent, the fact of a dismissal, including the names of all parties, is public information and is available upon request.

For a copy of the Final Investigative Report for this case contact:

> U.S. Department of Housing and Urban Development
> Melody Taylor, Director
> Region III, Office of Fair Housing and Equal Opportunity
> The Wanamaker Building
> 100 Penn Square East
> Philadelphia, PA  19107-3380

On behalf of the Department of Housing and Urban Development

MELODY TAYLOR<br>Digitally signed by MELODY TAYLOR<br>DN: CN = MELODY TAYLOR C = US O = U.S. Government OU =<br>Department of Housing and Urban Development, Office of Administration<br>Date: 2020.06.05 16:50:49 -04'00'

June 5, 2020

Melody Taylor, Director                                    Date

# Exhibit I
## Letter from Davita Center





To: DaVita Patients and Caregivers

From: PDI Walnut Tower Dialysis Center

Subject: Dialysis Treatment Chair Time

Dear _Burnett, John_

We value the time you spend in the clinic with us during your treatment, and have recognized that timeliness is a concern for you and your caregivers. As of **6/15/2020** we will implement set chair times per DaVita best practices and policies.

Your appointment time will be set from _5:30A – 10:00 A_, _1st_ shift on _MWF_.

We will partner with your transportation services to inform them of these changes.

In order to make sure we start your treatment on time, please arrive to the clinic lobby **fifteen minutes before your treatment time**.

The clinic staff will also let you know as soon as possible if your treatment time is delayed. Your treatment could be delayed due to the following reasons:

- **Your health**. For example, your blood pressure is too low to start treatment, we are having trouble inserting your needle, etc.
- **Other patient or clinic concerns**. For example, we may need a few extra minutes to help the patient before you with issues, we need a few extra minutes to clean your chair, etc.

Lastly, if you need to reschedule your appointment or you are having transportation problems, please contact the clinic as soon as possible and speak with the clinic social worker or an administrator.

Thank you,

Your PDI Walnut Tower Dialysis Center Team

# END STAGE RENAL DISEASE MEDICAL EVIDENCE REPORT
## MEDICARE ENTITLEMENT AND/OR PATIENT REGISTRATION

| A. COMPLETE FOR ALL ESRD PATIENTS | Check one: | [X] Initial | [ ] Re-entitlement | [ ] Supplemental |
|---|---|---|---|---|

**1. Name** *(Last, First, Middle Initial)*

Burnett, John

| 2. Medicare Claim Number | 3. Social Security Number | 4. Date of Birth |
|---|---|---|
| | | 02/23/1964 |

| 5. Patient Mailing Address *(Include City, State and Zip)* | 6. Phone Number |
|---|---|
| 2911A GAUL ST | (267) 773-8883 |
| PHILADELPHIA, PA, 19134-4308 | |

| 7. Sex | 8. Ethnicity | 9. Country/Area of Origin or Ancestry |
|---|---|---|
| [X] Male  [ ] Female | [X] Not Hispanic or Latino   [ ] Hispanic or Latino (Complete Item 9) | |

**10. Race** *(Check all that apply)*

[ ] White  [ ] Asian
[X] Black or African American  [ ] Native Hawaiian or Other Pacific Islander*
[ ] American Indian/Alaska Native

Print Name of Enrolled/Principal Tribe   *complete Item 9

**11. Is patient applying for ESRD Medicare coverage?**
[ ] Yes  [X] No

| 12. Current Medical Coverage *(Check all that apply)* | 13. Height | 14. Dry Weight | 15. Primary Cause of Renal Failure *(Use code from back of form)* |
|---|---|---|---|
| [ ] Medicaid  [X] Medicare  [ ] Employer Group Health Insurance | INCHES 72 OR | POUNDS ____ OR | E1122 |
| [ ] DVA  [X] Medicare Advantage  [ ] Other  [ ] None | CENTIMETERS ____ | KILOGRAMS 136 | |

**16. Employment Status** *(6 mos prior and current status)*

**17. Co-Morbid Conditions** *(Check all that apply currently and/or during last 10 years)* *See instructions

| PRIOR | CURRENT | | | |
|---|---|---|---|---|
| [ ] | [ ] | Unemployed | a. [ ] Congestive heart failure | n. [ ] Malignant neoplasm, Cancer |
| [ ] | [ ] | Employed Full Time | b. [ ] Atherosclerotic heart disease ASHD | o. [ ] Toxic nephropathy |
| [ ] | [ ] | Employed Part Time | c. [ ] Other cardiac disease | p. [ ] Alcohol dependence |
| [ ] | [ ] | Homemaker | d. [ ] Cerebrovascular disease, CVA, TIA* | q. [ ] Drug dependence* |
| [ ] | [ ] | Retired due to Age/Preference | e. [ ] Peripheral vascular disease* | r. [ ] Inability to ambulate |
| [X] | [X] | Retired (Disability) | f. [X] History of hypertension | s. [ ] Inability to transfer |
| [ ] | [ ] | Medical Leave of Absence | g. [ ] Amputation | t. [ ] Needs assistance with daily activities |
| [ ] | [ ] | Student | h. [X] Diabetes, currently on insulin | u. [ ] Institutionalized |
| | | | i. [ ] Diabetes, on oral medications |   1. [ ] Assisted Living |
| | | | j. [ ] Diabetes, without medications |   2. [ ] Nursing Home |
| | | | k. [ ] Diabetic retinopathy |   3. [ ] Other Institution |
| | | | l. [ ] Chronic obstructive pulmonary disease | v. [ ] Non-renal congenital abnormality |
| | | | m. [ ] Tobacco use (current smoker) | w. [ ] None |

**18. Prior to ESRD therapy:**

| | | | | |
|---|---|---|---|---|
| a. Did patient receive exogenous erythropoietin or equivalent? | [ ] Yes [ ] No [X] Unknown | If Yes | [ ] <6 months [ ] 6-12 months [ ] > 12 months | |
| b. Was patient under care of a nephrologist? | [X] Yes [ ] No [ ] Unknown | If Yes | [ ] <6 months [X] 6-12 months [ ] > 12 months | |
| c. Was patient under care of kidney dietitian? | [ ] Yes [ ] No [X] Unknown | If Yes | [ ] <6 months [ ] 6-12 months [ ] > 12 months | |

d. For hemodialysis patients only, what access was used on first outpatient dialysis?   [ ] AVF  [ ] Graft  [X] Catheter  [ ] Other

If not AVF, then: is maturing AVF present?   [ ] Yes [X] No

Is maturing graft present?   [ ] Yes [X] No

**19. Laboratory Values Within 45 Days Prior to the Most Recent ESRD Episode. (Lipid Profile within 1 Year of Most Recent ESRD Episode).**

| LABORATORY TEST | VALUE | DATE | LABORATORY TEST | VALUE | DATE |
|---|---|---|---|---|---|
| a.1. Serum Albumin (g/dl) | 3.5 | 04/24/2017 | d.  HbA1c | ____ % | |
| a.2. Serum Albumin Lower Limit | | | e.  Lipid Profile  TC | ____ | |
| a.3. Lab Method Used (BCG or BCP) | | | LDL | ____ | |
| b.  Serum Creatinine (mg/dl) | 4.5 | 04/24/2017 | HDL | ____ | |
| c.  Hemoglobin (g/dl) | 9.5 | 04/25/2017 | TG | ____ | |

## B. COMPLETE FOR ALL ESRD PATIENTS IN DIALYSIS TREATMENT

| 20. Name of Dialysis Facility | 21. Medicare Provider Number (for Item 20) |
|---|---|
| DAVITA - WALNUT TOWERS | |

| 22. Primary Dialysis Setting | 23. Primary Type of Dialysis |
|---|---|
| [ ] Home  [X] Dialysis Facility/Center  [ ] SNF/Long Term Care Facility | [X] Hemodialysis (Sessions per week 3/hours per session 4) [ ] CAPD [ ] CCPD [ ] Other |

| 24. Date Regular Chronic Dialysis Began | 04/25/2017 | 25. Date Patient Started Chronic Dialysis at Current Facility | 05/01/2017 |
|---|---|---|---|

**26. Has patient been informed of kidney transplant options?**
[X] Yes  [ ] No

**27. If patient NOT informed of transplant options, please check all that apply:**
[ ] Medically unfit   [ ] Patient declines information
[ ] Unsuitable due to age   [ ] Patient has not been assessed

## C. COMPLETE FOR ALL KIDNEY TRANSPLANT PATIENTS

| 28. Date of Transplant | 29. Name of Transplant Hospital | 30. Medicare Provider Number for Item 29 |
|---|---|---|
| __/__/____ | | |

Date patient was admitted as an inpatient to a hospital in preparation for, or anticipation of, a kidney transplant prior to the date of actual transplantation.

| 31. Enter Date | 32. Name of Preparation Hospital | 33. Medicare Provider number for Item 32 |
|---|---|---|
| __/__/____ | | |

| 34. Current Status of Transplant (if functioning, skip items 36 and 37) | | 35. Type of Donor: |
|---|---|---|
| ☐ Functioning | ☐ Non-Functioning | ☐ Deceased   ☐ Living Related   ☐ Living Unrelated |

| 36. If Non-Functioning, Date of Return to Regular Dialysis | 37. Current Dialysis Treatment Site |
|---|---|
| __/__/____ | ☐ Home   ☐ Dialysis Facility/Center   ☐ SNF/Long Term Care Facility |

## D. COMPLETE FOR ALL ESRD SELF-DIALYSIS TRAINING PATIENTS (MEDICARE APPLICANTS ONLY)

| 38. Name of Training Provider | 39. Medicare Provider Number of Training Provider (for Item 38) |
|---|---|
| | |

| 40. Date Training Began | 41. Type of Training | |
|---|---|---|
| | ☐ Hemodialysis | a. ☐ Home   b. ☐ In Center |
| | ☐ CAPD   ☐ CCPD | ☐ Other |

| 42. This Patient is Expected to Complete (or has completed) Training and will Self-dialyze on a Regular Basis. | 43. Date When Patient Completed, or is Expected to Complete, Training |
|---|---|
| ☐ Yes     ☐ No | __/__/____ |

*I certify that the above self-dialysis training information is correct and is based on consideration of all pertinent medical, psychological, and sociological factors as reflected in records kept by this training facility.*

| 44. Printed Name and Signature of Physician personally familiar with patient's training | 45. UPIN of Physician in Item 44 |
|---|---|
| | __/__/____ |
| a.) Printed Name     b.) Signature     c.) Date | |

## E. PHYSICIAN IDENTIFICATION

| 46. Attending Physician (Print) | 47. Physician's Phone No. | 48. UPIN of Physician in Item 46 |
|---|---|---|
| ██████████ | ██████████ | ██████████ |

### PHYSICIAN ATTESTATION

*I certify, under penalty of perjury, that the information on this form is correct to the best of my knowledge and belief. Based on diagnostic tests and laboratory findings, I further certify that this patient has reached the stage of renal impairment that appears irreversible and permanent and requires a regular course of dialysis or kidney transplant to maintain life. I understand that this information is intended for use in establishing the patient's entitlement to Medicare benefits and that any falsification, misrepresentation, or concealment of essential information may subject me to fine, imprisonment, civil penalty, or other civil sanctions under applicable Federal laws.*

| 49. Attending Physician's Signature of Attestation (Same as Item 46) | 50. Date |
|---|---|
| *(signature)* | 06/30/2017 |

| 51. Physician Recertification Signature | 52. Date |
|---|---|
| | __/__/____ |

53. Remarks

## F. OBTAIN SIGNATURE FROM PATIENT

*I hereby authorize any physician, hospital, agency, or other organization to disclose any medical records or other information about my medical condition to the Department of Health and Human Services for purposes of reviewing my application for Medicare entitlement under the Social Security Act and/or for scientific research.*

| 54. Signature of Patient (Signature by mark must be witnessed) | 55. Date |
|---|---|
| *(signature)* | 06/30/2017 |

## G. PRIVACY STATEMENT

The collection of this information is authorized by Section 226A of the Social Security Act. The information provided will be used to determine if an individual is entitled to Medicare under the End Stage Renal Disease provisions of the law. The information will be maintained in system No. 09-70-0520, "End Stage Renal Disease Program Management and Medical Information System (ESRD PMMIS)", published in the Federal Register, Vol. 67, No. 116, June 17, 2002, pages 41244-41250 or as updated and republished. Collection of your Social Security number is authorized by Executive Order 9397. Furnishing the information on this form is voluntary, but failure to do so may result in denial of Medicare benefits. Information from the ESRD PMMIS may be given to a congressional office in response to an inquiry from the congressional office made at the request of the individual; an individual or organization for research, demonstration, evaluation, or epidemiologic project related to the prevention of disease or disability, or the restoration or maintenance of health. Additional disclosures may be found in the Federal Register notice cited above. You should be aware that P.L. 100-503, the Computer Matching and Privacy Protection Act of 1988, permits the government to verify information by way of computer matches.

FORM CMS-2728-U3 (08/15)                                          As of 06/30/2017, this form is in a Submitted status

# Exhibit J

ADA.gov - ADA Requirements: Wheelchairs
Mobility Aids, and
Other Power-Driven Mobility Devices

J

Case 2:22-cv-02329-MSG   Document 6   Filed 06/13/22   Page 109 of 166

# ADA.gov <sub>BETA</sub>

## We're working on a new ADA.gov.

**Visit the beta site →**

---

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*





# Wheelchairs, Mobility Aids, and Other Power-Driven Mobility Devices

The Department of Justice published revised final regulations implementing the Americans with Disabilities Act (ADA) for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010, in the Federal Register. These requirements, or rules, clarify and refine issues that have arisen over the past 20 years and contain new, and updated, requirements, including the 2010 Standards for Accessible Design (2010 Standards).

## Overview

**People with mobility, circulatory, respiratory, or neurological disabilities use many kinds of devices for mobility. Some use walkers, canes, crutches, or braces. Some use manual or power wheelchairs or electric scooters. In addition, advances in technology have given rise to new devices, such as Segways®, that some people with disabilities use as mobility devices, including many veterans injured while serving in the military. And more advanced devices will inevitably be invented, providing more mobility options for people with disabilities.**

This publication is designed to help title II entities (State and local governments) and title III entities (businesses and non-profit organizations that serve the public) (together, "covered entities") understand how the new rules for mobility devices apply to them. These rules went into effect on March 15, 2011.

- Covered entities must allow people with disabilities who use manual or power wheelchairs or scooters, and manually-powered mobility aids such as walkers, crutches, and canes, into all areas where members of the public are allowed to go.

- Covered entities must also allow people with disabilities who use other types of power-driven mobility devices into their facilities, unless a particular type of device cannot be accommodated because of legitimate safety requirements. Where legitimate safety requirements bar accommodation for a particular type of device, the covered entity must provide the service it offers in alternate ways if possible.

- The rules set out five specific factors to consider in deciding whether or not a particular type of device can be accommodated.

## Wheelchairs

Most people are familiar with the manual and power wheelchairs and electric scooters used by people with mobility disabilities. The term "wheelchair" is defined in the new rules as "a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor or of both indoor and outdoor locomotion."

## Other Power-Driven Mobility Devices

In recent years, some people with mobility disabilities have begun using less traditional mobility devices such as golf cars or Segway®. These devices are called "other power-driven mobility device" (OPDMD) in the rule. OPDMD is defined in the new rules as "any mobility device powered by batteries, fuel, or other engines… that is used by individuals with mobility disabilities for the purpose of locomotion, including golf cars, electronic personal assistance mobility devices… such as the Segway® PT, or any mobility device designed to operate in areas without defined pedestrian routes, but that is not a wheelchair". When an OPDMD is being used by a person with a mobility disability, different rules apply under the ADA than when it is being used by a person without a disability

## Choice of Device



People with disabilities have the right to choose whatever mobility device best suits their needs. For example, someone may choose to use a manual wheelchair rather than a power wheelchair because it enables her to maintain her upper body strength. Similarly, someone who is able to stand may choose to use a Segway® rather than a manual wheelchair because of the health benefits gained by standing. A facility may be required to allow a type of device that is generally prohibited when being used by someone without a disability when it is being used by a person who needs it because of a mobility disability. For example, if golf cars are generally prohibited in a park, the park may be required to allow a golf car when it is being used because of a person's mobility disability, unless there is a legitimate safety reason that it cannot be accommodated.

## Requirements Regarding Mobility Devices and Aids

Under the new rules, covered entities must allow people with disabilities who use wheelchairs (including manual wheelchairs, power wheelchairs, and electric scooters) and manually-powered mobility aids such as walkers, crutches, canes, braces, and other similar devices into all areas of a facility where members of the public are allowed to go.



In addition, covered entities must allow people with disabilities who use any OPDMD to enter the premises unless a particular type of device cannot be accommodated because of legitimate safety requirements. Such safety requirements must be based on actual risks, not on speculation or stereotypes about a particular type of device or how it might be operated by people with disabilities using them.

• For some facilities -- such as a hospital, a shopping mall, a large home improvement store with wide aisles, a public park, or an outdoor amusement park -- covered entities will likely determine that certain classes of OPDMDs being used by people with disabilities can be accommodated. These entities must allow people with disabilities using these types of OPDMDs into all areas where members of the public are allowed to go.

• In some cases, even in facilities such as those described above, an OPDMD can be accommodated in some areas of a facility, but not in others because of legitimate safety concerns. For example, a cruise ship may decide that people with disabilities using Segways® can generally be accommodated, except in constricted areas, such as passageways to cabins that are very narrow and have low ceilings.

• For other facilities -- such as a small convenience store, or a small town manager's office -- covered entities may determine that certain classes of OPDMDs cannot be accommodated. In that case, they are still required to serve a

person with a disability using one of these devices in an alternate manner if possible, such as providing curbside service or meeting the person at an alternate location.

Covered entities are encouraged to develop written policies specifying which kinds of OPDMDs will be permitted and where and when they will be permitted, based on the following assessment factors.

## Assessment Factors

In deciding whether a particular type of OPDMD can be accommodated in a particular facility, the following factors must be considered:

- the type, size, weight, dimensions, and speed of the device;

- the facility's volume of pedestrian traffic (which may vary at different times of the day, week, month, or year);

- the facility's design and operational characteristics (e.g., whether its business is conducted indoors or outdoors, its square footage, the density and placement of furniture and other stationary devices, and the availability of storage for the OPDMD if needed and requested by the user);

- whether legitimate safety requirements (such as limiting speed to the pace of pedestrian traffic or prohibiting use on escalators) can be established to permit the safe operation of the OPDMD in the specific facility; and

- whether the use of the OPDMD creates a substantial risk of serious harm to the immediate environment or natural or cultural resources, or poses a conflict with Federal land management laws and regulations.

It is important to understand that these assessment factors relate to an entire class of device type, **not** to how a person with a disability might operate the device. (See next topic for operational issues.) All types of devices powered by fuel or combustion engines, for example, may be excluded from indoor settings for health or environmental reasons, but may be deemed acceptable in some outdoor settings. Also, for safety reasons, larger electric devices such as golf cars may be excluded from narrow or crowded settings where there is no valid reason to exclude smaller electric devices like Segways[®].

Based on these assessment factors, the Department of Justice expects that devices such as Segways[®] can be accommodated in most circumstances. The Department also expects that, in most circumstances, people with disabilities using ATVs and other combustion engine-driven devices may be prohibited indoors and in outdoor areas with heavy pedestrian traffic.

## Policies on the Use of OPDMDs

In deciding whether a type of OPDMD can be accommodated, covered entities must consider all assessment factors and, where appropriate, should develop and publicize rules for people with disabilities using these devices. Such rules may include –



- requiring the user to operate the device at the speed of pedestrian traffic;

- identifying specific locations, terms, or circumstances (if any) where the devices cannot be accommodated;

- setting out instructions for going through security screening machines if the device contains technology that could be harmed by the machine; and

- specifying whether or not storage is available for the device when it is not being used.

## Credible Assurance

3/10/22, 7:06 PM
Case 2:22-cv-02329-MSG Document 6 Filed 06/13/22 Page 112 of 166
ADA Requirements: Wheelchairs, Mobility Aids, and Other Power-driven Mobility Devices



An entity that determines it can accommodate one or more types of OPDMDs in its facility is allowed to ask the person using the device to provide credible assurance that the device is used because of a disability. If the person presents a valid, State-issued disability parking placard or card or a State-issued proof of disability, that must be accepted as credible assurance on its face. If the person does not have this documentation, but states verbally that the OPDMD is being used because of a mobility disability, that also must be accepted as credible assurance, unless the person is observed doing something that contradicts the assurance. For example, if a person is observed running and jumping, that may be evidence that contradicts the person's assertion of a mobility disability. However, it is very important for covered entities and their staff to understand that the fact that a person with a disability is able to walk for a short distance does not necessarily contradict a verbal assurance -- many people with mobility disabilities can walk, but need their mobility device for longer distances or uneven terrain. This is particularly true for people who lack stamina, have poor balance, or use mobility devices because of respiratory, cardiac, or neurological disabilities. A covered entity cannot ask people about their disabilities.

## Staff Training

Ongoing staff training is essential to ensure that people with disabilities who use OPDMDs for mobility are not turned away or treated inappropriately. Training should include instruction on the types of OPDMDs that can be accommodated, the rules for obtaining credible assurance that the device is being used because of a disability, and the rules for operation of the devices within the facility.

**For more information about the ADA, please visit our website or call our toll-free number.**

**ADA Website**

**www.ADA.gov**

To receive e-mail notifications when new ADA information is available,

visit the ADA Website's home page and click the **link** near the top of the middle column.

**ADA Information Line**

800-514-0301 (Voice) and 800-514-0383 (TTY)

24 hours a day to order publications by mail.

M-W, F 9:30 a.m. – 5:30 p.m. , Th 12:30 p.m. – 5:30 p.m. (Eastern Time) to speak with an ADA Specialist.

All calls are confidential.

For persons with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged. January 2014

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this document, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

January 31, 2014

Case 2:22-cv-02329-MSG Document 6 Filed 06/13/22 Page 113 of 166

# Exhibit K

<u>Notice of Lease Violation
dated January 04, 2019</u>



Philadelphia, PA 19105
215-925-9090
Fax: 215-925-9091
TTY# 800-654-5984



<u>HAND DELIVERED</u>

# <u>NOTICE OF LEASE VIOLATION</u>

<u>TO:</u>    **John Burnett**        **Unit# 0316**                              **Date:  1/04/2019**

Please be advised that we have recorded the following incidents in your tenant file: **Violation of American Postal Workers House/ 801 Residence House Rules, <u>Tenant Responsibilities</u>, on pg. 2, "Tenant, family, agent or guest shall not engage in any activity that would constitute an offense against person, property, public order, public health, decency or that involves fraud, deception, firearms or other weapons.  ."**

## <u>THE ABOVE WAS COMMITTED BY</u>

**You_ X _ Your children _ Visitor _**

**Description of the incident:**
**( ) 1.Destruction of property**
**( ) 2. Disturbing or harassing other tenants**
**( ) 3. Excessive noise from your unit**
**( ) 4. Drunk and disorderly**
**( ) 5. Illegal activities on the premises**
**( ) 6. Failure to maintain unit in a clean and sanitary condition**
**( ) 7. Leaving garbage, trash or other obstruction in a public area**
**( ) 8. Allowing an unauthorized person to live in the unit**
**( ) 9. Failure to allow landlord or his agent to enter the premises**

1 | P a g e

Philadelphia, PA 19106
215-925-9090
Fax: 215-925-9091
TTY# 800-654-5984

 

( ) 10. Alteration or addition to property not authorized, in writing, by landlord.
(X) 11. Breach of building security/safety
( ) 12. Failure to report change in income.
( ) 13. Unlawful activities causing police action on the property.
(X) 14. Other

Comments: On 12/23/2018 and 12/24/2018 building staff reported that you had been screaming racial slurs at them. Please be reminded that this behavior is considered verbally abusive and inappropriate. The staff that you directed these racial slurs towards are considering their options at this time. Your abusive and inappropriate behavior must stop.
Thank you,

Joseph Berger
Property Manager

# Exhibit L
## Eviction Action, Filed July 30, 2019
### *Withdrawn November 14, 2019*

L



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge       John J. Joyce, Deputy Court Administrator

**# LT-19-07-30-7978**

```
American Postal Workers
114 Forrest Ave Suite 100
Narberth, PA 19072
```

*Plaintiff*

```
JOHN BURNETT
AKA/DBA: & All Occupants
801 LOCUST STREET # 316
Philadelphia, PA 19107
```

*Defendant(s)*

KENNETH L BARITZ

_____
**Plaintiff/Attorney**
**Attorney #** _____022616_____

**Address &
Phone**

100 S. BROAD SUITE 1205
PHILADELPHIA, PA 19110
215-557-8608

# O R D E R

**AND  NOW,** to  wit  this  _____14th____ day  of  _____November_____,  ___2019___,  upon consideration  of  the  above  captioned  complaint,  it  is  hereby  ordered  and  decreed  that  the  above  captioned case be marked as follows:

```
TapeID: 3 Start Position: 11:18 End Position: 11:18
```

```
Withdrawn without Prejudice.
```

**BY THE COURT:**

MARISSA BRUMBACH
_____
(M. DAVIS-BROOKS)  **J.**

51 (07/09/01)



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge          John J. Joyce, Deputy Court Administrator

**# LT-19-07-30-7978**

```
American Postal Workers
114 Forrest Ave Suite 100
Narberth, PA 19072
```

```
JOHN BURNETT
AKA/DBA: & All Occupants
801 LOCUST STREET # 316
Philadelphia, PA 19107
```

*Plaintiff*                                    *Defendant(s)*

KENNETH L BARITZ

_____
**Plaintiff/Attorney**
**Attorney #** _____022616_____

**Address &**   100 S. BROAD SUITE 1205
**Phone**       PHILADELPHIA, PA 19110
                215-557-8608

# O R D E R

**AND NOW,** to wit this ____26th____ day of _____September_____, ____2019____, upon consideration of the above captioned complaint, it is hereby ordered and decreed that the above captioned case be marked as follows:

```
(SUBPOENA ISSUED)
```

```
Continued By Subpoena To 11/14/2019 8:45 AM in Room: 3.
```

**BY THE COURT:**

MARISSA BRUMBACH
_____
                L. Goldstein  **J.**

51 (07/09/01)



**PHILADELPHIA MUNICIPAL COURT**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107
Patrick F. Dugan, President Judge   John J. Joyce, Deputy Court Administrator

# NOTICE OF APPEARANCE

LT-19-07-30-7978

American Postal Workers
114 Forrest Ave Suite 100
Narberth, PA 19072

| AT EL | 1339 Chestnut Street 6th Floor Philadelphia, PA 19107 |
|---|---|

| DATE/FECHA: | TIME/HORA: | ROOM/SITIO: |
|---|---|---|
| November 14th, 2019 | 08:45 AM | 3 |

Plaintiff

vs.

JOHN BURNETT
AKA/DBA: & All Occupants
801 LOCUST STREET # 316
Philadelphia, PA 19107

Defendant

**YOU ARE COMMANDED BY ORDER OF THE COURT TO APPEAR IN THIS CASE AT THE PRECISE TIME AND PLACE INDICATED ABOVE.  FAILURE TO DO SO MAY RESULT IN A DISMISSAL/OR DEFAULT JUDGMENT OF YOUR CASE.**

Usted esta obligado por la corte, a comparecer en esta caso en la hora precisa y sitio indicado arriba.  Failo en hacerlo puede resultar en un fallo o decision judicial.

_____
*Plaintiff/Attorney*

_____
*Court Officer/Court Clerk*

**BRING THIS NOTICE WITH YOU**
*TRAIGA ESTA NOTA CON USTED*

_____
*Defendant's Signature (firma del Acusado)*



THE MUNICIPAL COURT COMPLIES WITH THE AMERICANS WITH DISABILITIES ACT, WHICH REQUIRES THAT ALL COURT SERVICES AND FACILITIES BE ACCESSIBLE TO PERSONS WITH DISABILITIES ON AN EQUAL BASIS TO THOSE WITHOUT DISABILITIES. IF YOU HAVE A DISABILITY AND REQUIRE REASONABLE ACCOMMODATIONS TO FILE A CLAIM, PARTICIPATE IN MUNICIPAL COURT PROCEEDING, OR USE ANY SERVICE PROVIDED BY THE COURT, PLEASE CALL 215-686-7986. REQUESTS FOR REASONABLE ACCOMMODATIONS MUST BE MADE AT LEAST THREE BUSINESS DAYS BEFORE ANY HEARING, OR WITHIN THREE BUSINESS DAYS AFTER SERVICE (DELIVERY) OF THE NOTICE OF HEARING, WHICHEVER IS LATER.



LA CORTE MUNICIPAL CUMPLE CON EL DECRETO DE AMERICANO INCAPACITADOS (AMERICAN WITH DISABILITIES ACT).  ESTE DECRETO REQUIERE QUE TODOS LOS SERVICIOS Y FACILIDADES DE CORTE SEAN ACCESSIBLE A PERSONAS INCAPACITADAS, AL IGUAL QUE PERSONAS NO INCAPACITADAS.  SE USTED ESTE INCAPACITADO Y NECIESITA ACOMODACIONES RAZONABLES, PARA PODER RADICAR UNA DEMANDA, PARTICIPAR EN ALGUN PROCEDIMIENTO O UTILIZAR SERVICIOS EN LA CORTE MUNICIPAL POR FAVOR LLAME AL TELEFONO 215-686-7986.  PARA SOLICITAR ACOMODACIONES RAZONABLES, DEBE LAMAR POR LOS MENOS TRES DIAS DE TRABAJO ANTES DE SU AUDIENCIA O DENTRO DE TRES DIAS DESPUES DE RECIBIR SU CITA, SEGUN O QUE OCURRA PRIMERO.

# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge  John J. Joyce, Deputy Court Administrator

**#** LT-19-07-30-7978

| | |
|---|---|
| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072 | JOHN BURNETT<br>AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107 |
| *Plaintiff(s)* | *Defendant(s)* |

## SUBPOENA – SIGNATURE OVERFLOW PAGE

| Party Name | Signature |
|---|---|
| IAN CHARLTON | |



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge     John J. Joyce, Deputy Court Administrator

# LT-19-07-30-7978

| | |
|---|---|
| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072 | JOHN BURNETT<br>AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107 |
| *Plaintiff* | *Defendant(s)* |

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: <u>IAN CHARLTON</u>

Signature:        IAN CHARLTON

Name: <u>IAN CHARLTON</u>
Attorney No. (if applicable):<u>022616</u>



COMMUNITY LEGAL SERVICES
OF PHILADELPHIA

August 30, 2019

John Joyce
Operational Manager
Philadelphia Municipal Court
1339 Chestnut St.
10th Fl.
Philadelphia, PA 19107

**Re: American Postal Workers v. Burnett;**
**LT-19-07-30-7978;**
**Continuance Request;**

Hi Mr. Joyce,

The first listing for this matter is scheduled for **September 13, 2019**. My client has dialysis on Mondays, Wednesdays, and Fridays. I am requesting that this matter be postponed to a Tuesday or Thursday other than September 17 or 19.

I reached out to the Plaintiff's attorney regarding making this request jointly and have not yet heard back.

Please let me know if you have any questions or concerns.

Sincerely,

Ian Charlton, Esq.

CC: Ken Baritz, Attorney for the Plaintiff, via Electronic Mail



### PHILADELPHIA MUNICIPAL COURT
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**

D1

1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107
Patrick F. Dugan, President Judge   John J. Joyce, Deputy Court Administrator

#   LT-19-07-30-7978

| Petitioner/Plaintiff: American Postal Workers 114 Forrest Ave Suite 100 Narberth, PA 19072 | Hearing Date: 09/13/2019 |
|---|---|

| Respondent/Defendant: JOHN BURNETT, AKA/DBA: & All Occupants 801 LOCUST STREET # 316 Philadelphia, PA 19107     Defendant #:  2380062 | Courtroom/Time: 3 08:45 AM |
|---|---|

**Notice of Intent to Defend:** No

## AFFIDAVIT OF SERVICE

1) I served _____ on __/__/__ , at _____ , __.M.

2) Location of Service Address   _801 Locust Street #316_____

☐ at home   ☐ place of business   ☐ other

3)      (fill in one box)

☐ Defendant personally served.
☐ Adult family member with whom said Defendant(s) reside(s).
☐ Adult in charge of Defendant(s) residence.
☐ Adult in charge of Defendant(s) residence who refuses to give name or relationship.
☐ Manager/Clerk of Place of Lodging In Which Defendant(s) Reside(s).
☐ Agent or person in charge of Defendant(s) office or usual place of business.

☐ Other _____

Name_____   Title/Relationship _____

Age_____ Height _____ Weight _____ Race _____ Sex _____

## AFFIDAVIT OF NO SERVICE

1) _8/11/19_ , at _10:20_ , A.M. ☐ Moved  ☐ Unknown  ☒ No Answer  ☐ Vacant  ☐ Other

2) _8/13/19_ , at _8:11_ , P.M. ☐ Moved  ☐ Unknown  ☐ No Answer  ☐ Vacant  ☒ Other

3) __/__/__ , at _____ , __.M. ☐ Moved  ☐ Unknown  ☐ No Answer  ☐ Vacant  ☐ Other

If Other _____  _Posted_ _____
(Explanation)

I VERIFY that: 1) I am a competent adult over the age of eighteen, 2) I am not a party to this action, or an employee of a party in the action, and 3) that all of the statements made herein are true and correct and I acknowledge that I am subject to the penalties of 18 PA C.S. §4904 relating to Unsworn Falsification to Authorities.

_Mark DeJesse_
Signature of Server        Print or Type:

Name of Server:  **Mark DeJesse**
Address:  **1080 N. Delaware Ave.**
Phone Number:  **215-925-6400**

S6-10/05/01

10003-2561609-10-zS



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge        John J. Joyce, Deputy Court Administrator

**#** LT-19-07-30-7978

| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072 | JOHN BURNETT<br>AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107 |
|---|---|
| *Plaintiff* | *Defendant(s)* |

## AFFIDAVIT OF NON-MILITARY SERVICE

The undersigned, being duly sworn according to law, deposes and says that he/she (is) (represents) the Plaintiff(s) in the above entitled case; that he/she is authorized to make this affidavit on behalf of the plaintiff(s); and that, to the best of his/her knowledge, the defendant(s) is/are not in the Military Service of The United States, nor any State or Territory thereof or its allies as defined in the Soldiers' and the Sailors' Civil Relief Act of 1940 and the amendments thereto.

I am an attorney for the plaintiff(s), the plaintiff's authorized representative or have a power of attorney for the plaintiff(s) in this landlord tenant action. I hereby verify that I am authorized to make this verification; that I have sufficient knowledge, information and belief to take this verification or have gained sufficient knowledge, information and belief from communications with the plaintiff or the persons listed below and that the facts set forth are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to the penalties set forth in 18 Pa. C.S. &sect; 4904, which concerns the making of unsworn falsifications to authorities. If I am an authorized representative or have a power of attorney, I have attached a completed Philadelphia Municipal Court authorized representative form or a completed power of attorney form.

_____
Signature – Plaintiff/Attorney

I hereby acknowledge receipt of the following affidavit forms, which I understand must be properly completed, notarized and presented to the Court at the Hearing:

☐   Medical Affidavit

☐   Repair Affidavit

☐   Affidavit of Service By Mail

_____
Signature – Plaintiff/Attorney

9-01/16/02



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge    John J. Joyce, Deputy Court Administrator

# LT-19-07-30-7978

| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072 | JOHN BURNETT<br>AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107 |
|---|---|
| *Plaintiff* | *Defendant(s)* |

## CERTIFICATE OF COMPLIANCE

    I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Kenneth Baritz, 100 S. Broad St., Suite 1205, Philadelphia, PA 19110, 22616, (2

Signature:      KENNETH L BARITZ

Name: Kenneth Bar tz, 100 S. Broad St., Suite 1205, Ph iladelphia, PA 19110, 22616, (215) 557-8608, kbaritz

Attorney No. (if applicable): 022616



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge   John J. Joyce, Deputy Court Administrator

Court Room   3   at 08:45 AM on 09/13/2019          # LT-19-07-30-7978

| | |
|---|---|
| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072<br><br><br><br>*Plaintiff(s)* | JOHN BURNETT<br>AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107<br><br><br><br>*Defendant(s)* |

## <u>What to do if you receive a Landlord-Tenant Complaint that you have been sued in Housing Court</u>

1. **Read and understand the Landlord-Tenant Complaint.** You are the **Defendant**; the person, group of corporation suing you is the **Plaintiff**.

2. The Complaint will ask a judgment for money and possession (eviction from the property) be entered against you.

3. Check the Complaint for the location, date and time of hearing.

4. You have a right to attend the hearing and to present your defense to the Court. You as an individual are not required to have an Attorney to represent you. You should bring with you to Court all documents to support your case, such as rent books, receipts, canceled checks, bills, lease, letters, notices and photos.

5. If you do not appear at the hearing, the Court can decide in favor of the other party. A judgment by default can be entered against you for any money owed and can result in your eviction.

**IF YOU HAVE ANY QUESTIONS, CALL OR VISIT THE MUNICIPAL COURT LANDLORD-TENANT OFFICE, 1339 CHESTNUT STREET, ROOM 1000, PHILADELPHIA, PA 19107 9:00 A.M. TO 4:00 P.M., MONDAY THROUGH FRIDAY OR CALL (215) 686-2901 OR (215) 686-7988.**

**IF YOU HAVE A DISABILITY AND REQUIRE ASSISTANCE IN ORDER TO PARTICIPATE IN A MUNICIPAL COURT PROCEEDING, PLEASE CONTACT US AT 215-686-7986.**

\*     \*     \*     \*     \*     \*
## NOTICE OF JUDGMENT OF POSSESSION

Date: _____          Claim No. _____

A money judgment has been entered against you in the amount of $_____ rent, $_____, physical damages, $_____, other, for a total amount of $_____, plus costs $_____. The Court found the monthly rent to be $_____.

Judgment of possession has been entered against you effective _____ based upon:

    [ ] Non-payment of rent;          [ ] Termination of the term of the lease;          [ ] Breach of condition of the lease

You may appeal to the Court of Common Pleas of Philadelphia within ten (10) days from the date of this notice if the Court has determined that your lease is residential. You may appeal to the Court of Common Pleas of Philadelphia within thirty (30) days from the date of this notice if the Court has determined that your lease is nonresidential. You are advised that the filing of the appeal is governed by the Rules of Civil Procedure of the Court of Common Pleas. Strict compliance with those rules is required. Unless you are thoroughly familiar with the appeal rules, it is suggested that you consult an attorney to pursue your appeal.

If no appeal is taken within the applicable period, and you do not vacate the property by the date referred to herein, the Sheriff or Landlord and Tenant Officer has the authority to serve upon you an *Alias Writ* and forcibly evict you.

If the Judgment of Possession was issued based upon non-payment of rent only, then you may bring the rent up to date and be permitted to stay in the property. However, if the Judgment of Possession against you is based upon any reason other than non-payment of rent, then you must vacate the property in accordance with the date stated herein or effectuate an appeal to the Court of Common Pleas.

Any further questions relating to this matter should be referred to the Judgments and Petitions Unit at (215) 686-7334

***If you decide to take an appeal in this matter, you must bring this form with you when you file your Notice of Appeal.***



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107

Patrick F. Dugan, President Judge          John J. Joyce, Deputy Court Administrator

# LANDLORD AND TENANT COMPLAINT

Date Filed: 07/30/2019                          # LT-19-07-30-7978

## Complaint Continuation

| | |
|---|---|
| American Postal Workers<br>114 Forrest Ave Suite 100<br>Narberth, PA 19072<br><br>*Plaintiff(s)* | JOHN BURNETT, AKA/DBA: & All Occupants<br>801 LOCUST STREET # 316<br>Philadelphia, PA 19107<br><br>*Defendant(s)* |

**I.**   Plaintiff states that he/she/it owns the real property located at the following address: 801 LOCUST STREET # 316, Philadelphia, PA 19107. Plaintiff further states that there is a lease between him/her/it and the above-referenced defendant(s). The lease is written, attached and began on 09/01/2017 for the term of a year or more. Additionally, plaintiff states that the lease is residential.

**II.**   Plaintiff states that he/she/it is in compliance with Section 9-3902 of the Philadelphia Code by having a valid Rental License at the time of filing this complaint.
   * The Effective Date of the license is 02/04/2019 and its Expiration Date is 02/29/2020

**III.**   Plaintiff states that he/she/it is in compliance with Section 9-3903 of the Philadelphia Code as a result of having provided the tenant with a Certificate of Rental Suitability and a copy of the City of Philadelphia Partners for Good Housing Handbook prior to the first month for which he/she/it is seeking unpaid rent in paragraph XI and the Certificate of Rental Suitability that was provided was issued by the Department no more than sixty days prior to the inception of the tenancy. A copy of any Certificate of Rental Suitability provided to the tenant is attached.
   * Certificate - Date Issued by Department 07/13/2017

**IV.**   Plaintiff states that the leased property:

   **A.**   was built before March of 1978.

   **B.**   is not a residential property developed by or for an educational institution for the exclusive use and occupancy by that institution's students.

   **C.**   is owned or subsidized by the Philadelphia Housing Authority or its subsidiaries, or privately owned and leased under the Housing Choice Voucher Program; and

   **D.**   has not had and will not have a child aged six or younger.

   **E.**   The lease is effective from December 21, 2012 to the present.

**V.**   I have not provided the defendant with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe.



# PHILADELPHIA MUNICIPAL COURT
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
1339 Chestnut Street, 10th Floor, Philadelphia, PA 19107
Patrick F. Dugan, President Judge          John J. Joyce, Deputy Court Administrator

# LANDLORD AND TENANT COMPLAINT

Date Filed: 07/30/2019                      # LT-19-07-30-7978

## Complaint Continuation

**VI.**   Plaintiff states that the subject premises is fit for its intended purpose.

Plaintiff states that he/she/it is unaware of any open notice issued by the Department of Licenses and Inspections ("Department") alleging that the property at issue is in violation of one or more provisions of the Philadelphia Code.

**VII.**   Plaintiff states that notice to vacate the subject premises by 08/22/2019 was given to the defendant on 07/23/2019. A copy of the notice is attached.

**VIII.**   The defendant is in possession of the property and refuses to surrender possession of the property.

**IX.**   Plaintiff demands a judgment of possession

\* Breach of a condition(s) of the lease other than nonpayment of rent. The conditions allegedly breached were:
threats/harassment of management staff

ONGOING RENT IN THE AMOUNT OF $261.00 FROM THE DATE OF THE FILING OF THIS COMPLAINT TO THE DATE OF THE HEARING ON THE MERITS IN THIS MATTER.

| | |
|---|---|
| **Filing Party:** Kenneth Baritz, 100 S. Broad St., Suite 1205, Philadelphia, PA 19110, 22616, (215) 557-8608, kbaritz@baritzlaw.com<br>100 S. BROAD, SUITE 1205, PHILADELPHIA, PA 19110 | **Phone Number:**<br>215-557-8608 |

| | | |
|---|---|---|
| I am an attorney for the plaintiff(s), the plaintiff's authorized representative or have a power of attorney for the plaintiff(s) in this landlord tenant action. I hereby verify that I am authorized to make this verification; that I have sufficient knowledge, information and belief to take this verification or have gained sufficient knowledge, information and belief from communications with the plaintiff or the persons listed below and that the facts set forth are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to the penalties set forth in 18 Pa. C.S. &sect; 4904, which concerns the making of unsworn falsifications to authorities. If I am an authorized representative or have a power of attorney, I have attached a completed Philadelphia Municipal Court authorized representative form or a completed power of attorney form.<br><br><br>**KENNETH L BARITZ**<br>_____<br>Signature Plantiff/Attorney | **SUMMONS TO THE DEFENDANT:**<br>You are hereby ordered to appear at a hearing scheduled as follows:<br>**LOCATION (SITO):**<br>1339 Chestnut Street 6th Floor<br>Philadelphia, PA 19107<br>Hearing Room: 3 | **CITATION:** Al demandado por la presente, usted esta dirijido a presentarse a la siguiente:<br>**DATE (FECHA):**<br>September 13th, 2019<br>**TIME (HORA):**<br>08:45 AM |
| **NOTICE TO THE DEFENDANT: YOU HAVE BEEN SUED IN COURT. PLEASE SEE ATTACHED NOTICE.** | **NOTA IMPORTANTE PARA EL ACUSADO: USTED HA SIDO DEMANDO EN CORTE: POR FAVOR MIRA PAPELE ESCRITA.** | |

# Exhibit M
Notice to Vacate
dated July 23, 2019



*Kenneth L. Baritz & Associates, P.C.*
ATTORNEYS AT LAW

KENNETH L. BARITZ
TODD L. BARITZ
CORY M. BARITZ
JEROME M. FEINBERG*
*DECEASED

100 S. Broad St.
Suite 1205
PHILADELPHIA, PENNSYLVANIA 19110

(215) 557-8608
Fax No. (215) 557-3539

OF COUNSEL
HARRY F. FEINBERG *
* Member of PA & NJ bars

July 23, 2019

JOHN BURNETT
All Occupants
801 LOCUST STREET # 316
Philadelphia PA 19107

RE:   NOTICE TO VACATE; TERMINATION OF LEASE; BREACH OF LEASE

Dear Tenant,

Please be advised that this office represents the owner of the above premises, which you occupy. You are in default of your lease due to threats/harassment of management staff. The balance owed is $0.00 through July 31, 2019.

You must vacate the leased premises within Thirty (30) days from the date of this letter. In addition, a Landlord & Tenant Complaint will be filed against you immediately.

Please bear in mind that this notice in no way relieves you of your responsibilities and obligations pursuant to the terms and conditions of your written lease agreement, including, but not limited to the payment of rent for the remainder of the lease term, even if you vacate. This letter is being sent in addition to any letters or notices that you have received.

**This is an attempt to collect a debt. Accordingly, any information obtained will be used for that purpose. Unless you notify this office in writing within thirty (30) days after receiving this notice that you dispute the validity of the debt or any portion thereof, this office will assume the debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice that the debt, or any portion thereof, is disputed, this office will obtain verification of the debt and mail it to you.**

**This thirty (30) day right to dispute the validity of the debt does not mean we cannot file a Landlord & Tenant Complaint or take other action against you within the thirty (30) day period. However, if you dispute the validity of the debt in writing within thirty (30) days, we will not proceed with such action until we send the verification to you.**

Very truly yours,

KENNETH L. BARITZ

# Exhibit N
Notice of Material Lease Violation
dated June 17, 2019



*(F)*

**801 Residence/ American Postal Workers House**
**801 Locust Street**
**Philadelphia, PA 19107**
**215-925-9090**
**Fax: 215-925-9091**
**TTY# 800-654-5984**

*Hand Delivered*
*U.S. Mailed.*

 

EQUAL HOUSING OPPORTUNITY    WE HAVE FACILITIES FOR THE DISABLED

## NOTICE OF MATERIAL LEASE VIOLATIONS

TO: John Burnett                    UNIT: #316                    DATE:  6/17/2019

Please be advised that we have recorded the following incidents in your tenant file: Violation of Lease, Pg. 7, Section 23. 6, (a): "Criminal activity by a tenant, any member of the tenant's household, a guest or another person under the tenant's control; that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents including property management staff…"

### THE ABOVE WAS COMMITTED BY:

You_X_ Your Children _____ Visitor _____

Description of the incident:
( ) 1.Destruction of property
(X) 2. Disturbing or harassing other tenants and /or management staff
( ) 3. Excessive noise from your unit
( ) 4. Drunk and disorderly
( ) 5. Illegal activities on the premises
( ) 6. Failure to maintain unit in a clean and sanitary condition
( ) 7. Leaving garbage, trash or other obstruction in a public area
( ) 8. Allowing an unauthorized person to live in the unit
( ) 9. Failure to allow landlord or his agent to enter the premises
( ) 10. Alteration or addition to property not authorized, in writing, by landlord.
( ) 11. Breach of building security/safety
( ) 12. Failure to report change in income.
( ) 13. Unlawful activities causing police action on the property
( ) 14. Other

Comments: On 6/13/19 and 6/14/19, you verbally harassed and threatened violence against 801 Management that resulted in the authorities being called to the premises.

Joseph Berger
Site Manager

## Notice Termination of Tenancy
## Material Lease Violation

Date:    06/17/19

| Property Name: | 801 Residence | Telephone: | 215-925-9090 |
|---|---|---|---|
| Address: | 801 LOCUST ST. | Fax: | 215-925-9091 |
| Address 2: | PHILADELPHIA, PA 19107 | TTD/TTY: | 711 National Voice Relay |
| | | Email | 801Manager@bergercos.com |

| To Name of HOH | John Burnett |
|---|---|
| Unit # | 0316 |
| Address: | 801 LOCUST STREET |
| City, State, Zip: | PHILADELPHIA, PA 19107 |

Request for appeal required by: 7/1/19

Dear Mr. Burnett:

In accordance with HUD regulations, the owner/agent and/or property staff is required to monitor residents' compliance with the lease terms. PLEASE TAKE NOTICE that you are in violation of your written lease agreement. The violation(s) are listed as follows *(check all that apply)*:

☐ Assault of residents, residents' guests, residents' service providers, property staff, vendors hired by the property, HUD or HUD's representatives
☒ Endangering residents, residents' guests, residents' service providers, property staff, vendors hired by the property, HUD or HUD's representatives
☐ Criminal activity engaged on or near the property by the resident or any resident guest or service provider
☐ Failure to provide a Social Security Number and adequate documentation to verify the Social Security Number for any non-exempt household member
☐ Misrepresenting eligibility status in regard to income, age, criminal history, landlord history, etc.
☐ Using Oxygen equipment in an unsafe manner
☐ Failure to pay rent as agreed by the lease
☐ Failure to return assistance-paid-in-error as agreed in a repayment agreement (three (3) late payments in any twelve-month period or any one (1) missed payment) Note: *Eviction for this purpose does not indicate forgiveness of the requirement to return assistance-paid-in-error to HUD.*
☐ Discovery that a resident failed to fully and accurately disclose income information or information about changes in household composition that results in assistance-paid-in-error (second such violation)
☐ Failure to enter in to a repayment agreement or refusal to return assistance paid in error
☐ Verification that a member of a household commits fraud in relation to HUD housing provided on this property
☐ Committing an act, covered under the Violence Against Women Act (the owner/agent may choose to seek bifurcation of the lease to protect the victim)
☐ Discovery that any household member (including live-in aides) is subject to any sex offender registration
☒ Interfering with property staff, vendors hired by the property, HUD or HUD's representatives
☐ Violation of rules regarding firearms and weapons
☐ Participating in the use, distribution or manufacture of illegal or controlled substances *(based on federal law)*
☐ Failure to recertify as required by HUD
☐ Failure to pay rent
☐ Other
Please note the requirements set forth in *(check all that apply and supply the appropriate reference)*:

☒ The HUD Model Lease **Page 7, Section 23. 6 (a)**
☐ The House Rules _____
☐ The Pet Rules _____
☐ The Assistance Animal Rules _____
☐ The VAWA Addendum
☐ The Live-in Aide Addendum _____



revised 7/2017

## Notice Termination of Tenancy
## Material Lease Violation

Your House Rules specifically state that certain lease violations will result in immediate termination of tenancy (eviction). These are considered **material lease violations and will result in termination of tenancy (eviction) in accordance with HUD requirements.**

Let this letter serve as notice that we are hereby issuing to you as lease holder of apartment located at 801 LOCUST STREET, UNIT 316 PHILADELPHIA, PA 19107, a Notice to Vacate. You are required to vacate your unit and surrender all keys on or before 07/17/2019.

If you and all household members have not vacated the unit on the termination date specified, the owner/agent will seek to enforce the termination in court. You may present a defense at that time.

**Mr. Burnett,** rent is due and payable in certified funds on or before **07/05/2019** in the amount of $ **161.00** **(pro-rated rental amount from 7/1-7/17/19** This amount must be added to any outstanding or overdue balances.

You will be given the opportunity to participate in a move-out inspection. At that time, the owner/agent will inspect the unit and compare the unit condition to the condition reported during the move-in inspection.

Charges for damages (not normal wear and tear) will be determined. These charges will be added to any outstanding balance. If there is an outstanding rent balance or if there are damages to the unit, the owner will use the security deposit to pay for outstanding rent and/or damages.

Any remaining deposit balance will be returned to the head-of-household. If there is still a balance due, after the application of the security deposit, the owner/agent will issue an invoice for any remaining balance due. If an invoice is issued, the balance is due upon receipt.

If you disagree with the decision to terminate tenancy, you may request a meeting to discuss/appeal the termination. Reasons to appeal include:
- You believe the decision has been made in error
- You believe there are extenuating circumstances that should be considered
- You or a member of your household is a victim of abuse covered by the Violence Against Women Act and you feel your status as a victim contributes to the decision to terminate
- You or a member of your household is a person with a disability, and you would like to request a reasonable accommodation
- Your household is being terminated because the household includes someone who is a registered sex offender and you wish to remove that household member

You must make the request to appeal the termination in writing by the response date indicated above, which is ten (10) business days from today's date. The owner/agent will accept the request in an equally effective manner, as a reasonable accommodation, if there is the presence of a disability. Such requests are to be submitted to the property management office. If we do not receive a meeting request from you within ten (10) business days, the decision to terminate will be considered final.

Upon your request, any staff person engaged in the initial review will not be involved in the appeal. You may bring a representative of your choice to assist you in the appeal meeting.

We will provide you with a final decision within five (5) business days of the meeting.

**Consideration of Extenuating Circumstances and/or the Need for Reasonable Accommodation**
The owner/agent will consider extenuating circumstances.



## Notice Termination of Tenancy
## Material Lease Violation

You have the right to request a reasonable accommodation to assist in facilitating a meeting with the owner/agent.   The owner/agent will consider extenuating circumstances where this would be required as a matter of reasonable accommodation.

### Protections Provided Through the Violence Against Women Act Reauthorization of 2013

HUD provides protections for victims of domestic violence, dating violence, stalking and sexual assault.  This is true for women and men and is true for persons affiliated with the victims who experience imminent threat. Victims are still required to comply with the requirements set forth in the Tenant Selection Plan and the lease (including lease attachments).

If you would like additional information about the property VAWA policy, please reference your application package or contact the property staff.  If you would like to exercise your VAWA protections, please contact the management office within ten (10) business days of the date of this notice.

### Questions Concerning this Notice

The owner/agent is dedicated to providing decent, safe, and affordable housing to our residents.  If you have any questions about this notice, please contact the management office.

If you have difficulty understanding English, please request our assistance and we will ensure that you are provided with meaningful access based on your individual needs.

Si usted tiene dificultad para entender el inglés, por favor solicite nuestra asistencia y nos aseguraremos de se proporcionan con acceso significativo basado en sus necesidades individuales.

Your response to this notice does not preclude you from exercising other avenues available if you believe that you are being discriminated against on the basis of race, color, religion, sex, national origin, familial status, or handicap.

As always, we make every effort to ensure that you continue to receive housing assistance so that you can enjoy your home in our community.  The owner/agent is dedicated to providing decent, safe, and affordable housing to our residents.  If you have any questions about this notice, please contact the management office.  We look forward to hearing from you.

_____

Property Manager
Cc: Resident File
**Attachment:  HUD 5380 VAWA Notice/HUD 5382 VAWA Certification**

---

The owner/agent does not discriminate on the basis of disability status in the admission or access to, or treatment or employment in, its federally assisted programs and activities.

The person named below has been designated to coordinate compliance with the nondiscrimination requirements contained in the Department of Housing and Urban Development's regulations implementing Section 504 (24 CFR, part 8 dated June 2, 1988).

Name:  Robert Berger
Address: 114 Forrest Avenue
City  Philadelphia                   State        PA        Zip 19072
Telephone – Voice: 610-660-8501
Telephone – TTY: 711 Voice Relay

7

# Exhibit O
## Letter for Meeting
## dated June 21, 2019



# 801 Residence/ American Postal Workers House

**801 Locust Street**
**Philadelphia, PA 19107**
**215-925-9090**
**Fax: 215-925-9091**
**TTY# 800-654-5984**



U.S. CERTIFIED MAIL

6/21/2019

John Burnett
801 Locust Street
Apartment # 0316
Philadelphia, PA 19107

RE: 6/19/2019 Appeal Meeting Follow-up

Dear Mr. Burnett.

Thank you for meeting with me today to discuss your lease termination notice.

Based upon our discussion, your lease termination will continue 7/17/2019 will be your last day of tenancy at 801 Locust Street. If you do not leave the premises, we will file a tenant eviction order with Philadelphia Landlord Tenant Court.

Respectfully,

Robert Berger

CC: Joseph Berger, Property Manager
    Tenant File

# Exhibit P
## Letter for Meeting
## dated June 28, 2019





# 801 Residence/ American Postal Workers House

801 Locust Street
Philadelphia, PA  19107
215-925-9090
Fax: 215-925-9091
TTY# 800-654-5984



U.S. CERTIFIED MAIL

6/28/2019

John Burnett
801 Locust Street
Apartment # 0316
Philadelphia, PA 19107

RE: 6/19/2019 Appeal Meeting Follow-up

Dear Mr. Burnett.

Thank you for meeting with me on June 19th, 2019 to discuss your lease termination notice.

Based upon our discussion and the egregious nature of the lease violations, your lease termination will continue. <u>July 17th, 2019 will be your last day of tenancy in Unit #0316 at 801 Locust Street, Philadelphia, PA 19107.</u>

If you do not leave the premises, we will file a tenant eviction order with Philadelphia Landlord Tenant Court.

Respectfully,

Robert Berger

CC: Joseph Berger, Property Manager
Tenant File

# Exhibit Q
## Letter to Deny Reasonable Accommodation dated January 4, 2019



# 801 Residence/ American Postal Workers House
**801 Locust Street**
**Philadelphia, PA  19107**
**215-925-9090**
**Fax: 215-925-9091**
**TTY# 800-654-5984**



HAND DELIVERED AND
EMAILED TO RESIDENT

1/4/2019

John Burnett
801 Locust Street
Apartment # 0316
Philadelphia, PA 19107
Johnburnett585@gmail.com

Good Morning Mr. Burnett,

Mr. Burnett, please be reminded that several months ago, when you first started using a motorized scooter at 801 Locust, we discussed your temporary use of the elevator with moving pad installed when available. We both agreed that this plan would be in your best interest due to your observed difficulties navigating your scooter through the building.

Up until December 23, 2018 our plan had been successful implemented, on December 23, 2018 at 4:45am, you called the front requesting the elevator, the guard on duty that took your call was either unaware or had forgotten of the courtesies extended to you, of having the elevator sent to you on the third floor.

Your allegations that I directed you to use one elevator is incorrect. Your scooter fits in every elevator. Now that several months have passed and you have gotten comfortable with the scooter, the courtesy that had been extended to you will end with the receipt of this letter.

# Exhibit R
## Letter for Meeting; Re: Reasonable Accommodation, dated December 20, 2018



*Have believed are emailed*

# Notice - Request for Meeting
## Reasonable Accommodation/Modification Request

Date:    12/20/18

| Property Name: | APWH/ 801 Residence | Telephone: | 215-925-9090 |
|---|---|---|---|
| Address: | 801 Locust Street | Fax: | 215-925-9091 |
| Address 2: | Phila., PA 19107 | | 711 National Voice Relay |
| | | Email | 801Manager@bergercos.com |

| TO:   Name: | John Burnett |
|---|---|
| Address: | 801 Locust Street, Apt. #0315 |
| City, State, Zip | Philadelphia, PA 19107 |

**Response required by: 4/05/2019**

Dear Mr. John Burnett:

We have received your request for a reasonable accommodation/modification. We would like to meet with you to discuss your request and to obtain information to ensure that you are afforded every consideration.

At this meeting, we will talk about the accommodation you have requested
To be moved down the hallway to be closer to elevator.

Please come ready to talk about the changes you requested and bring copies of any information you think might help us understand what you need.

At your request, we will make a reasonable accommodation in order to conduct this meeting.

We would like to meet: 04/11/2018 @ 4:00PM in Management Office

If this is not convenient, please contact us, within five (5) business days of the date of this letter, to arrange an alternative date, time, or location. You may bring a representative of your choice to the meeting or you may have a representative attend the meeting on your behalf.

**Consideration of the Need for Reasonable Accommodation**
You have the right to request a reasonable accommodation to assist in facilitating a meeting with the owner/agent.

**Questions Concerning this Notice**
The owner/agent is dedicated to providing decent, safe, and affordable housing to our residents.

If you are disabled and wish to request a reasonable accommodation or if you have difficulty understanding English, please request our assistance and we will ensure that you are provided with meaningful access based on your individual needs.



# Notice - Request for Meeting
## Reasonable Accommodation/Modification Request

Si usted está incapacitado y desea solicitar un acomodo razonable o si tiene dificultad para entender Inglés, por favor solicite nuestra asistencia y nos aseguraremos de que se le proporciona un acceso significativo basado en sus necesidades individuales

Your response to this notice does not preclude you from exercising other avenues available if you believe that you are being discriminated against on the basis of race, color, religion, sex, national origin, familial status, or handicap.

We are dedicated to ensuring continued enjoyment of your home in our community. If you have any questions about this notice, please contact the management office.

_____

Property Manager
Cc: Resident File

---

*(Owner or project name) does not discriminate on the basis of disability status in the admission or access to, or treatment or employment in, its federally assisted programs and activities.*
*The person named below has been designated to coordinate compliance with the nondiscrimination requirements contained in the Department of Housing and Urban Development's regulations implementing Section 504 (24 CFR, part 8 dated June 2, 1988).*

Name: Joseph Berger
Address: 801 Locust Street
City   Philadelphia      State     PA     Zip   19107
Telephone – Voice: 215-925-9090
**Telephone – TTY: 711 NATIONAL VOICE RELAY**



# Exhibit S
<u>Email to Landlord</u>
<u>Re: Life-Threatening Event</u>

S

Thank you,

Joseph

-----Original Message-----
From: Jay Burnett <johnburnett585@gmail.com>
Sent: Monday, December 24, 2018 4:58 PM
To: Manager - 801 <801Manager@bergercos.com>
Subject: Incident Regarding Security Officer CJ Han
Importance: High

Good afternoon Mr. Berger,

I am corresponding with you regarding the unprofessional and possible life threatening conduct of your security officer CJ Han, on the early morning of Sunday, December 23, 2019 at approximately 4:45am, I placed a called to the security desk to request that the freight elevator be summoned to the 3rd floor, at which time the officer asked me why I needed the freight elevator, are you moving something, I said no I am not in addition to informing him that I needed it for transport purposes to the ground floor in order to attend my dialysis session, I preceded to wait at the elevator for the next 15 to 20 minutes until a woman just so happen to exit the requested elevator, once I reached the ground floor I asked the officer why didn't he send the elevator as I requested and I observed that he never moved, Joe this life-threatening conduct from this particular officer towards me is completely over the top as I quickly realized that this was clearly not an isolated incident with this individual. Joe we are to the point, that if the proper corrective measures are not taken regarding this individuals conduct and mannerisms towards me, I will be left with no recourse than to take this to the next level beyond yourself, the choice is yours? Joe, It should not much matter when I request the freight elevator via security as long as it is a valid reason, either dialysis treatment/and or some sort of activity which requires that my vehicle reach the ground floor, it is beyond time for your entire security staff to attend sensitivity training, as at present their overall conduct is uncouth. I most certainly will monitor the outcome of this matter closely before deciding if warrants further action on my behalf?

Regards,

JBurnett, Apartment 316

P.S. Can you please reply to confirm receipt? Additionally, I will be in need of the freight elevator the early morning of Sunday, December 30, 2018, thanks in advance!

# **Exhibit T**
## <u>Photos of Violation of Motorized Scooter (Red)</u>

T







# **Exhibit U**
## <u>HUD.GOV</u>
## <u>Property Listed as Low Income Elderly and</u>
## <u>Special Needs Housing</u>



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN JAMES BURNETT )<br>Plaintiff, )<br> )<br>v. )<br> )<br> )<br>AMERICAN POSTAL WORKERS )<br>HOUSE (APWH), Residential Property )<br>801 RESIDENCE, Residential Property )<br>CRM RESIDENTIAL, Management )<br>BERGER ASSOCIATES, LLC )<br>Management )<br>ROBERT BERGER, Owner/Property )<br>Manager )<br>JOSEPH BERGER, Property Manager )<br>NAKEISHA SIMMONS, Assistant )<br>Property Manager )<br>ERICA JOHNSON, Property Manager )<br>KENNETH GILYARD, Security Supervisor )<br>YVONNE McKOY, Security Guard )<br>ANTHONY JOHNSON, Security Guard )<br>SHAWN WILLIAMS, Security Guard )<br>C.J. HAN, Security Guard )<br>Defendants )<br> ) | CIVIL ACTION No. _____<br><br><br><br><br><br><br><br><br><br><br><br>Civil Action for: Disability Discrimination<br>Fair Housing Act (FHA), Americans With<br>Disabilities Act (ADA), Section 504, and<br>state-based based discrimination claims<br>under PHRA, and intentional and negligence<br>torts of infliction of emotional distress, and<br>defamation<br><br>JURY TRIAL DEMANDED |

## VERIFICATION

Pursuant to Fed.R.Civ.P. Rule 11, the undersigned counsel avers, under penalty of perjury, that the facts and averment contained in the foregoing Verified Complaint are true and correct to the best of his knowledge, understanding and belief.

_____   /s/ Lucas T. Nascimento, Esq.

Date:   *06/10/2022*           Lucas T. Nascimento, Attorney at Law
                               Land Title Building
                               100 S. Broad St., Ste. 1830
                               Philadelphia, PA 19110
                               P: 215-944-4428
                               C: 609-703-3441
                               Nascimentolaw@gmail.com

32